COMMONWEALTH vs. GEORGE D. PERROT.

Hampden. March 8, 1990. - June 4, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Constitutional Law,* Waiver of constitutional rights, Admissions and con-
fessions. *Waiver. Evidence,* Admissions and confessions. *Search and
Seizure,* Inevitable discovery. *Error,* Harmless.

With regard to a seventeen year old defendant's contention, raised on ap-
peal of a criminal case, that certain incriminating statements he made
to police officers should have been suppressed as evidence on the ground
that his apparent waiver of his Miranda rights was not voluntary be-
cause his contemplation of suicide, as evidenced by his having been
placed on a suicide watch after his last written statement had been
completed, left him devoid of will to protect himself from improper po-
lice interrogation, the record, including findings by the judge indicating
that the defendant made rational and informed choices in deciding to
cooperate with the police, demonstrated a sufficient factual and legal
basis for the denial of his motion to suppress. [543]
A pocketbook taken from the scene of a burglary, left partially concealed
("almost in plain view") in an area traveled by pedestrians, but not
found by anyone in the ten days that had elapsed before its being dis-
covered and seized on the basis of information unlawfully obtained by
the police, was improperly admitted as evidence at a subsequent trial,
where the judge's findings indicating a probability that the pocketbook
might have been found were insufficient to support a legal conclusion
that its discovery by lawful means was certain as a practical matter.
[544-548]
At a criminal trial, the judge's improper admission of certain physical evi-
dence taken from the scene of the crime, which might have had an
effect on the jury's resolution of the central issue in the case, was not
harmless beyond a reasonable doubt. [548-549]

INDICTMENTS found and returned in the Superior Court
Department on December 16, 1985.

Motions to suppress were heard by *John F. Murphy, Jr.,*
J., and the cases were tried before him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Yvonne P. Toyloy*, Committee for Public Counsel Services, for the defendant.

*Elizabeth G. Dineen*, Assistant District Attorney (*Jennifer N. Fitzgerald*, Assistant District Attorney, with her) for the Commonwealth.

GREANEY, J. The defendant was convicted on charges of aggravated rape, burglary and assault in a dwelling, unarmed robbery, indecent assault and battery, and battery. The charges and convictions pertained to the burglary of the residences of two elderly women in Springfield. On appeal, the defendant argues error in (1) the denial of his pretrial motion to suppress oral and written statements made by him to Springfield police, and (2) the admission in evidence of the pocketbook of one of the victims under the inevitable discovery rule.

1. An evidentiary hearing was held on the defendant's pretrial motion to suppress statements made by him to the police. The judge made findings of fact which are supported by the evidence that he deemed the most credible. We now summarize those findings.

In the fall of 1985, the Springfield police were investigating a series of house breaks in the Malibu Drive neighborhood. Several of the break-ins involved sexual attacks on elderly women. The defendant, who was seventeen years of age at the time of his arrest, was a suspect in the investigation. The defendant was known to the police, having been arrested more than ten times on other offenses prior to December 7, 1985.

At about 2:15 A.M. on December 7, 1985, Officer James Murphy of the Springfield police received a radio message in his cruiser to proceed to Allendale Circle to investigate a burglary. Murphy responded and obtained a description of the burglar. Murphy then proceeded to the area of Malibu Drive. Two women reported that a man had snatched the purse of one of them. They gave a description similar to the one given of the burglar, and informed Murphy that they

had chased the purse snatcher through the snow to Malibu Drive. The footprints in the snow matched a footprint seen at Allendale Circle and led to the defendant's residence. Murphy was familiar with the defendant, and the two descriptions he had been given resembled him.

Murphy called for assistance, and he and other officers were admitted to 87 Malibu Drive where the defendant lived with his sister and her husband. The defendant was found in his bedroom and placed under arrest. Murphy was assigned the task of taking the defendant from the house to the cruiser. As they started to enter the cruiser, the defendant ran away. The defendant was apprehended hiding in a backyard.

At about 3:30 A.M., Sergeant Thomas M. Kelly of the Springfield police department was called at home and informed of the defendant's arrest. He was in charge of the investigation of the attacks on elderly women. At about 5 A.M., Kelly and another officer met with the defendant in an interrogation room. The defendant was read his Miranda warnings. He signed a card acknowledging receipt of his rights and agreed to talk with Kelly. The defendant was also advised of his right to use the telephone and acknowledged this by signing a notice slip. The defendant declined to use the telephone at that time.

After being informed that he had been identified by the victim of the purse snatch, the defendant admitted that crime and the breaking and entering at Allendale Circle. The defendant denied any involvement in the attacks on elderly women. Kelly terminated his questioning of the defendant at about 5:30 A.M. to help in the preparation of an affidavit to support an application for a warrant to search the defendant's residence. The defendant at his own request remained in the interrogation room rather than being returned to a cell.

The defendant was interrogated three more times on December 7 by Detective Thomas Jarvis, who was also involved in the investigation of the attacks on elderly women. These interrogations took place at 7:30 A.M., 12:30 P.M., and 3 P.M.

The judge found that Miranda warnings were furnished to the defendant, and acknowledged by him, prior to the first two periods of questioning. The defendant signed a form agreeing to furnish the police with blood and hair samples. During the interrogation, the defendant made oral and written statements in which he admitted the purse snatch, the breaking and entering on Allendale ·Circle, and the breaking and entering of the residences of the two victims in this case. The defendant denied, however, that he had ever sexually attacked anyone. While giving his statement to Jarvis during the final· meeting at 3 P.M. the defendant became emotional, began to cry, and asked for a police officer's gun so he could shoot himself. After the last written statement had been completed, read, and signed, Jarvis, pursuant to prescribed police procedure, asked that the defendant be placed on a suicide watch.

At the hearing on the motion to suppress, the defendant testified that he could not recall giving the police any oral or written statements with regard to the crimes charged. On the evening prior to his arrest, the defendant claimed to have consumed, along with three other people, two six-packs of beer and a gram of cocaine, and to have himself ingested eight "number ten" Valium pills. On the date of the burglaries which were the subject of the trial, the defendant stated he had been drinking beer and had taken two "purple" Mescaline pills. The defendant also testified that he did not recall receiving Miranda warnings and did not recall signing any form acknowledging such warnings, that he had been threatened and beaten by the police, and that he was, throughout the long questioning process, under the influence of drugs and alcohol and confused by the lack of sleep. At the hearing, other witnesses also testified as to the defendant's version of the facts.

The judge rejected the defendant's contentions. The judge found that the defendant had exaggerated his consumption of alcohol and drugs. Photographs taken of the defendant while he was in police custody showed, according to the judge's findings, "clear facial views with no indication of bruises or

beating." The defendant had at least ten prior encounters with the police, and, during those experiences, had been exposed time and again to the content of the Miranda warnings. The defendant was aware of his rights, including his right to remain silent. The judge concluded that the motion to suppress should not prevail, and that the defendant's statements had been voluntarily made after knowing and intelligent waivers of his constitutional rights.

On this appeal, the defendant concentrates on the findings describing his emotional state and the fact that he was placed on a suicide watch. In the view of the defendant's appellate counsel, these findings indicate that the defendant could not have understood or waived his rights because his contemplation of suicide left him devoid of will to protect himself from improper police interrogation.

The judge did not consider the point now argued because it was not raised before him. The fact that the defendant's trial counsel did not consider it significant is of relevance. The judge's findings indicate that the defendant made rational and informed choices in deciding to cooperate with the police. The findings also suggest that the defendant's emotional state was natural for someone who had admitted the commission of serious crimes. Placing the defendant on a suicide watch was nothing more than normal police procedure. That fact, and the defendant's somewhat depressed state of mind at the end of his contacts with the police, do not mandate a conclusion that he was incompetent to waive his rights and confess voluntarily. The record demonstrates a sufficient factual and legal basis for the denial of the motion to suppress[1].

---

[1]The defendant's attempt to analogize the case to *Commonwealth* v. *Hosey*, 368 Mass. 571 (1975), is not persuasive. The defendant in that case had been arrested for drunkenness shortly before being interrogated. He was illiterate and had been observed by the police not only to be "extremely emotional" but also to be "detached from reality." *Id.* at 575. Further, correct Miranda procedure had not been followed. *Id.* at 576. These circumstances, and others present in the *Hosey* case, necessitated a conclusion that the defendant did not understand the significance of a waiver of his rights and, consequently, that an improper waiver had been

2. The second issue pertains to the admission in evidence of a pocketbook. The first victim's residence, located at 33 Covel Street in Springfield, was burglarized on November 30, 1985, shortly after 3 A.M. The victim was in her home at the time, but ran outside before encountering the burglar. Her pocketbook was taken. The second victim's residence, located at 27 Malibu Drive in Springfield, was broken into that same morning at approximately 4 A.M. This victim encountered the burglar, who indecently assaulted and raped her. Her change purse was taken. Neither victim was able to identify the intruder.

As has been indicated, on December 7, 1985, the defendant provided the police with a written statement which admitted the burglaries. This statement reads in part as follows: "I headed for number 33 Covel St. The reason I went there was I heard it had been broken into before. I had a pair of my sisters [sic] gloves on. They were like wool gloves. I entered an unlocked rear breezeway door at 33 Covel St. I kicked the rear inner door in. I entered the house and started looking through the house. I found a handbag and took it with me. I left through the rear door. *I left the pocketbook a few houses down the street.* I left 33 Covel St. and went to 27 Malibu Dr. I opened the door to the breezeway and kicked the side door in. I started to go through the house and a little black dog started barking and I ran out the side door." (Emphasis supplied.)

At trial, the Commonwealth sought to introduce a further statement made by the defendant on December 10, 1985, to Officer Richard Kane who had gone to the Hampden County house of correction (jail) to witness the taking of a blood sample from the defendant. The defendant had been arraigned and counsel appointed for him on December 9. Kane admitted that he knew of the defendant's arraignment when he began talking to him at the jail, but denied having any

induced. The facts in the case before us are fundamentally dissimilar. They show that the defendant was capable of understanding and waiving his constitutional rights, and that he voluntarily cooperated with the police inquiry in making his statements.

intention of going to the jail to engage the defendant in conversation. When the defendant began talking freely about his girl friend, Kane stopped him, identified himself, and advised the defendant of his Miranda rights. Kane then questioned the defendant about the Covel Street break-in. In the course of that questioning, the exact location of the abandoned pocketbook was disclosed. Kane transmitted the information to Sergeant Thomas Kelly who was in charge of the investigation. Kelly then went to the spot indicated, and found the pocketbook about five feet off the traveled way in some bushes near a house. The pocketbook was located about 300 yards from the first victim's residence (33 Covel Street) in a direct line along a traveled walking path toward the second victim's residence (27 Malibu Drive). The distance between 33 Covel Street and 27 Malibu Drive is less than one mile.

Relying on *Michigan* v. *Jackson*, 475 U.S. 625 (1986), the judge suppressed the defendant's December 10 statement made in response to interrogation initiated by Officer Kane because the statement was obtained in violation of the defendant's right to counsel. The Commonwealth does not contest this ruling. According to *Jackson*, "if police initiate interrogation after a defendant's assertion, at an arraignment . . . of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id.* at 636. The Commonwealth, however, sought to introduce the pocketbook in evidence under the inevitable discovery rule.

The judge conducted a voir dire on that issue. At that hearing, Sergeant Kelly testified that he was in charge of investigating the sexual assaults and robberies of elderly residents that had occurred over a two-month period in the Malibu Drive area. He had read the defendant's December 7 statement late in the afternoon of the same day. December 8 and 9 were his days off. On returning to work on December 10, Kelly intended to search the Covel Street area with every available man to try to locate the abandoned pocketbook. Before ordering the search, however, he received the more

specific information regarding the pocketbook's location contained in the defendant's statement to Officer Kane.

The judge allowed the Commonwealth's motion reasoning as follows: "From the information obtained on December 7, the police knew that the pocketbook was discarded within a few houses from 33 Covel Street, going in the direction of Malibu Drive. They knew the defendant was on foot when he threw the pocketbook away, that he was familiar with the neighborhood and was intending to break into 27 Malibu Drive. They could reasonably infer that he would take the shortest route. [Sergeant] Kelly is an experienced, 13-year police officer with 12½ years of service in the crime prevention bureau. Kelly was in charge of a serious investigation involving repeated, brutal sexual attacks on elderly females in their homes. The [first victim's] pocketbook was a vital piece of evidence which would corroborate the defendant's written confession and tie him directly to these crimes. I accepted Kelly's testimony that he was planning a multi-manned search of the area after obtaining the information on December 7. I also found that based on these facts, even if Kelly had not ordered the search, someone in the Police department would have demanded it once the reports were read.

"The location of the pocketbook itself was another factor that I considered. It was located a few feet off a driveway being used by the occupants of two adjacent homes and by pedestrians taking a shortcut to Parker Street. The pocketbook was almost in plain view and contained dozens of papers identifying [the first victim] as the owner . . . . It can reasonably be inferred that eventually a passerby would discover it and turn it in. (Apparently there was no money in the pocketbook when found.)"

In *Commonwealth* v. *O'Connor*, 406 Mass. 112 (1989), we adopted an inevitable discovery rule which complied with art. 14 of the Massachusetts Declaration of Rights. We indicated that application of the rule requires a two-step analysis which focuses, first, on the question of inevitability, and, second, on the character of the police misconduct. *Id.* at 117. As

to the first consideration, we indicated that the Commonwealth has the burden of proving the facts bearing on inevitability by a preponderance of the evidence and, once the relevant facts have been proved, that discovery by lawful means was "certain as a practical matter." *Id.* As to the second consideration, we stated that "the severity of the constitutional violation is critical in deciding whether to admit evidence that it is shown would inevitably have been discovered." *Id.* at 118. For example, we stated that evidence seized in violation of a search warrant requirement would not be admitted even if its subsequent lawful discovery was inevitable. *Id. Commonwealth* v. *Benoit*, 382 Mass. 210 (1981). We also stated that the "[b]ad faith of the police . . . will be relevant in assessing the severity of any constitutional violation." *Commonwealth* v. *O'Connor, supra.*

The judge did not have the benefit of the *O'Connor* decision when he ruled on the Commonwealth's motion. He followed instead the reasoning in *Nix* v. *Williams*, 467 U.S. 431 (1984), in which the United States Supreme Court applied its version of the inevitable discovery rule. As a consequence, the judge did not consider the second prong of the analysis required by *O'Connor* concerning the severity of the constitutional violation in terms of the presence or absence of police bad faith. The issue of bad faith is not of great relevance in the Federal application of the rule. *Nix* v. *Williams, supra* at 445-446.

In our view, the case turns on the resolution of the first part of the test — whether the pocketbook would have been inevitably discovered by lawful means. We accept the judge's findings of fact on that issue, including the finding, disputed by the defense, that Sergeant Kelly, or someone else in the police department, would have ordered a search of the area described in the defendant's statement of December 7. These facts, however, do not support a legal conclusion that the pocketbook's discovery was "certain as a practical matter," *Commonwealth* v. *O'Connor, supra* at 117, that is, virtually certain.

The consideration of inevitability is made on "circumstances existing at the time of the unlawful seizure." *Id.* at 117 n.4. In this case, those circumstances indicate that the pocketbook had been left partially concealed ("almost in plain view") in an area traveled by pedestrians. It had not been found by anyone in the ten days that had elapsed after the commission of the crimes. The findings suggest on their face that the police also might not have found it in any planned search because the judge infers that "eventually a passerby" would have seen the pocketbook, examined its contents, and been responsible enough to turn it over to the victim or to the police. No case has been brought to our attention involving a delay of this length in the discovery of concealed or partially concealed evidence in a public area, the discovery of which is made dependent on the sort of alternatives suggested here. The more typical situation involves a search where the sought-after evidence is discovered shortly after the commission of the crime either in plain view or in a reasonably obvious place. See, e.g., *Nix* v. *Williams*, *supra* at 449-450; *United States* v. *Webb*, 796 F.2d 60, 62 (5th Cir. 1986), cert. denied, 479 U.S. 1038 (1987); *State* v. *Tillery*, 107 Ariz. 34, 39, cert. denied, 404 U.S. 847 (1971). Compare *United States* v. *Owens*, 782 F.2d 146, 152-153 (10th Cir. 1986); *State* v. *Raj*, 368 N.W.2d 14, 16 (Minn. Ct. App. 1985). See also discussion in Note, The Inevitable Discovery Exception to the Constitutional Exclusionary Rules, 74 Colum. L. Rev. 88, 94-96 (1974). Even though the police had some general leads on the pocketbook's whereabouts, the over-all situation as to its eventual discovery was characterized by a measure of doubt and uncertainty. At best, the findings indicate to us a probability that the pocketbook might have been found. This is insufficient to satisfy the demanding test of inevitability. The evidence should have been excluded.

3. The remaining issue is whether the error was harmless beyond a reasonable doubt. *Chapman* v. *California*, 386 U.S. 18, 24 (1967). *Commonwealth* v. *Kelleher*, 395 Mass. 821, 827 (1985). *Commonwealth* v. *Garcia*, 379 Mass. 422, 441

(1980). Whether an error is harmless depends on many factors, *Delaware* v. *Van Arsdall*, 475 U.S. 673, 684 (1986), including whether the "erroneously admitted evidence was 'merely cumulative' of evidence properly before the jury." *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 n.8 (1987). The essential question is whether the error had, or might have had, an effect on the jury and whether the error contributed to or might have contributed to the verdicts. See *Commonwealth* v. *Marini*, 375 Mass. 510, 520 (1978). There were no identifications of the defendant by the victims. Both the fact, and the validity, of his statements to the police were strenuously denied by the defendant in his testimony at the trial. The defendant also denied throughout that he was involved in any sexual attacks on women. The judge characterized the pocketbook as "a vital piece of evidence," which he thought necessary to "corroborate the defendant's written confession and tie him directly to [the] crimes." The Commonwealth also maintained that view at trial. The presence of the pocketbook in evidence could have influenced the jury in their evaluation of the Commonwealth's proof on all the charges, particularly the proof on the existence of valid statements by the defendant. The jury could have reasoned that, despite the defendant's denials, the fact that he had made valid written statements was established because the police had been able to find, and place in evidence, the first victim's pocketbook. We conclude that there was prejudice because the pocketbook might have had an effect on the jury's resolution of the central issue in the case, the issue pertaining to the defendant's statements.

The judgments are reversed, the verdicts are set aside, and the cases are remanded for a new trial.

*So ordered.*