Welch, J.
The defendant Joseph LeClair moves to suppress two confessions that he gave to the Maine State Police and the Massachusetts State Police. The defendant claims that he did not knowingly and voluntarily waive his Miranda rights at the time of this custodial interrogation. In addition, the defendant claims that his statements were not voluntary. An extensive hearing was held on this motion that included the testimony of numerous witnesses.
One of the defendant’s primary arguments is that his Miranda waiver and statements were not voluntary because he believed he would be dead by the time of trial. This Court rejects this legal contention.
After evaluating the evidence presented and reviewing the law, I conclude that the defendant’s motion must be denied. Based on the totality of the circumstances, I find that the Commonwealth has proven beyond a reasonable doubt that the defendant knowingly, intelligently and voluntarily waived his Miranda rights. Furthermore, I find, again beyond a reasonable doubt, that his statements were voluntary.
FINDINGS OF FACT
In June of 1995, the defendant was living with his girlfriend, the victim Janice May, in Swampscott, Massachusetts. On June 2, 1995, the victim Janice May dropped the defendant off at a bar so that he could have some alcoholic beverages and watch a Boston Red Sox game. She went on to another drinking establishment where she told the defendant she was meeting some girlfriends. Arrangements were made for Ms. May to pick the defendant up later on that evening. The defendant was dropped off at the bar at approximately 7:00 p.m.. During the next seven hours (until closing time at 2:00 a.m.) the defendant consumed between 12 and 15 twelve ounce beers. This amount of alcoholic consumption over seven hours did not affect the defendant significantly. He believed he was still able to operate a motor vehicle (had he had one). As the defendant rather colorfully admitted to the police, he was “used to sucking down a case in a couple of hours.” Ms. May did not come and pick the defendant up as promised. Instead, the defendant obtained a ride to his home in Swampscott from a friend. The defendant then ingested two “short” lines of cocaine with his friend and drank a very small amount of wine (approximately 1 inch in a glass) with this friend. Again, the consumption of the cocaine and the very small amount of wine did not particularly affect the defendant’s mental abilities. Indeed, he stated the cocaine had no effect upon him whatsoever.
At approximately 4:30 a.m., Janice May still had not returned home and the defendant fell asleep. He was wakened at 7:00 a.m. when Janice May returned. A loud argument ensued. Accusations of infidelity were made by the defendant and the victim responded by informing the defendant that he was excessively controlling and that she did not love him. These statements made the defendant feel “rotten.” The argument ended when the defendant grabbed the victim by the throat while she laid in bed. He strangled her to death.
After killing the victim Janice May, the defendant wrote what might be termed a “suicide note” expressing his sorrow and asking for forgiveness. Thereafter, he obtained a firearm from the apartment, loaded the firearm, placed the gun in his mouth, and then lost his nerve. He took the gun from his mouth and fired the bullet into a wall of the apartment. The defendant decided he did not wish to take his own life until he said goodbye to his mother who lived in Maine. As the defendant explained: “I realized what I’d done. I couldn’t live so I took the gun and I was just going, say, tell my mother good-bye, I love her, I’m sony for what I did and I was going to shoot myself.” Thereupon he wrapped the firearm in a blanket and placed the loaded gun in his rented vehicle and began to drive from Swampscott, Massachusetts up to North Berwick, Maine. In Peabody, Massachusetts he filled his car up with gas. In New Hampshire he stopped at a McDonald’s Restaurant (at approximately 9 or 10 in the morning) and ate an Egg McMuffin and a soda. During this period of time he was suffering from a headache.
In the early afternoon (at approximately 1:00 or 2:00 p.m.), he arrived at this parents’ home. His mother was not present, she was at a craft fair at a local church, but his sister was at home. He informed *562 his sister that he had killed his girlfriend Janice May and that he was going to commit suicide because he wanted “to be with Janice” (the deceased). He then drove off to find his mother. The defendant drove toward the direction of the home of his brother (also a resident of Maine) in a nearby Town. The defendant’s sister immediately called the North Berwick Police. She informed the North Berwick Police that her brother had claimed to have killed a woman in Swampscott, Massachusetts and was threatening suicide.
Officer Stephen Peasley, a patrolman for the North Berwick Maine Police, received a communication from dispatch and proceeded directly to the home of the defendant’s parents. There he met the defendant’s sister, a Ms. Kelly Wood. Ms. Wood informed the officer that the defendant had just been at the address and informed her that he had killed his girlfriend and had threatened suicide. Ms. Wood provided the officer with certain grim details related by the defendant concerning the method of the victim’s death and identified her brother as Joseph LeClair. She stated that the defendant had wanted to say goodbye before committing suicide. She also described the vehicle in which he was driving.
During this period of time, the defendant apparently noticed his father driving on a nearby street. They talked briefly and arrangements were made to meet back at the family home on Sunset Avenue in North Berwick. Before or shortly after this encounter, the defendant again placed the gun in his mouth but did not pull the trigger because “I just couldn’t do it.”
Shortly thereafter, the South Berwick Police notified the North Berwick Police that they had located the defendant’s vehicle and was following it back to the location of the parents’ home in North Berwick. Upon arriving at the parent’s home on Sunset Avenue in North Berwick, the North Berwick Police (namely Officer Stephen Peasley) approached the defendant, handcuffed him and escorted him to the marked police cruiser. Officer Peasley was in full uniform at that time. The defendant later claimed (to a psychologist) that he was considering exiting his vehicle with the firearm that he brought with him from Swampscott, Massachusetts in the hopes that the North Berwick Police would then shoot him. The defendant did not do this, however, because he considered the presence of his young nephew (who apparently was at the parents’ home) and did not want his nephew to witness such an encounter. Thus, the defendant decided to be arrested peacefully and cooperate with the police.
Officer Peasley did not inform the defendant what he was being arrested for. As the defendant later related: “No they did not tell me what I was charged with. He says what happened [sic]. I said I want to confess I killed my fiancée.” On another occasion (when speaking to the Maine State Police) the defendant described the encounter in this way: “So I went back to my sister’s and a police car came in the other way and followed me and pulled up and I was just getting to tell my sister, call them and tell them I’m here. I just want to turn myself in.”
The arrest took place at approximately 2:30 p.m. on the afternoon of June 3, 1996. The defendant was placed handcuffed in the North Berwick Police cruiser. At that time, Sergeant Leo Harriman of the North Berwick Police Department obtained a card listing the so-called. “Miranda Rights” and approached the defendant. Facing the defendant, Sergeant Harriman identified himself as a police officer and told him that he had “something important to tell you.” Sergeant Harriman then began to slowly read from the Miranda card. Sergeant went through each of the Miranda Rights separately asking for a response from the defendant as to whether he understood each one. At first, the defendant nodded his head affirmatively, but Sergeant Harriman informed the defendant that he needed a verbal response. Thereafter, as to each of his rights, the defendant responded “yes” after he was read each of his rights and asked whether he understood. Furthermore, he stated that he would answer questions placed to him by the police. Sergeant Harriman then signed and dated the card and placed the time that the Miranda rights had been given. He also informed Mr. LeClair that he did not have any questions but other police officers would have questions to ask him in the future.
Thereupon, the defendant was transported to the North Berwick Police Station. He arrived at the police station at approximately 3:00 p.m. There is no formal booking procedure for an individual who arrives at the North Berwick Police Station (instead the booking occurs at the County Jail if the defendant is to be incarcerated). Therefore, the defendant (who was still handcuffed) was asked to sit in a comfortable chair located within an office. The defendant asked for cigarettes and water, each of which were given to him. He was also offered coffee but he refused. At approximately 3:30 p.m. the defendant dosed off to sleep for approximately one-half hour.
While being arrested and being at the police station, the defendant exhibited no signs of being intoxicated or incapacitated in anyway. He had no difficulty responding to questions, although his voice was soft in tone. All his responses to questions were appropriate and sensible. He exhibited no inability to walk or to function normally. While at the police station, the defendant joined in a conversation between Officer Peasley and Sergeant Harriman regarding Disney World in Florida. The defendant stated that he recently had been to Disney World and agreed with the officers that many of the items at Disney World were overpriced. At some point before 4:50 p.m., the defendant informed Officer Peasley that he had a headache and would like some Tylenol or other similar medication. The Officer informed the defendant that there was no *563 such medication in the police station. The defendant did not ask for any further medication or make further mention of his headache. Throughout his stay at the North Berwick police station, the defendant acted normally and in an appropriate fashion. When he was first arrested it appeared that he had been crying at some point in the recent past. The defendant did not cry at any time while at the police station.
The Maine State Police arrived at the North Berwick police station at approximately 4:30 p.m. Detective Robert Slattery of the Maine State Police was the State Police officer assigned to this matter. Slattery first met the defendant shortly after 4:30 p.m. and engaged in some small talk at that time regarding whether the defendant was comfortable and whether he could get him anything that would make him more comfortable. The defendant responded that he was comfortable and asked for nothing more. Slattery noticed nothing to indicate that the defendant was under the influence of drugs or alcohol. Again, all of the defendant’s responses were appropriate and sensible. Detective Slattery then suggested that the interview take place in the Chiefs office because there were more chairs located in the Chiefs office than in the office that the defendant had initially been placed. At 4:50 p.m., Detective Slattery began his interview. According to Maine State Police practice, the interview was tape recorded.
As playing the tape reveals, the questions from the Maine State Police were asked in a dignified, quiet tone of voice and the entire interview conducted in a professional manner. Near the beginning of the interview, Detective Slattery asked the defendant “do you remember when the first police officers came, what happened?” The defendant responded “they said put your hands up on your head and patted me down, and just put the cuffs on me and this other guy read me my rights.” As can be seen from this response, the defendant had a clear memory of the precise order of events relating to his arrest. He also recognized that his rights had been read to him. Detective Slattery then continued: “he read you your rights, the Miranda Rights? Did you understand each one?” The defendant responded: “okay.” The response of “okay” is, obviously, equivocal. It is difficult to know what one means by this statement “okay.” It may be interpreted as a response in the affirmative or, as is often the case, simply a verbal non-response encouraging the questioner to continue. In any event, when the defendant was asked by the Massachusetts State Police a couple of hours later, whether he had talked to Detective Slattery from the Maine State Police and whether that Detective had “reminded you of those rights and you told him at the time that you understood them. Is that correct?” The defendant responded: “Yah.” This is an unequivocal response that helps inform this judge that the defendant did plainly understand his Miranda rights when they were read to him (as he stated he did at the time they were read to him). The defendant then later unequivocally responded that he understood those rights.
It is true that Detective Slattery asked the defendant “do you want me to go over those [the Miranda rights]?” Again, the defendant responded “okay.” The defendant argues that this is an affirmative response that placed the police in a position of being required to reiterate the Miranda warnings at that time. From the totality of the evidence, I do not accept this argument. Again, the response of “okay" is equivocal. In this context, it appears to be a device used by the defendant simply to prompt the police officer to move on to the next topic or subject. In other words, the defendant stated “okay,” not as an affirmative or negative response, but as a verbal means of encouraging the questioner to continue. Contrast Commonwealth v. Brant, 380 Mass. 876, 880 (1980). See Commonwealth v. Raymond, 424 Mass. 382, 294 (1997). It is simply not a realistic interpretation of the conversation to construe the defendant’s comment of “okay” as an indication that he did not understand his Miranda rights or he wanted them to be repeated to him. After all, the defendant unequivocally responded that he did understand each of his Miranda rights as they were read to him as he was in the police cruiser. Indeed, he told the Maine State Police that a police officer “read me my rights.” Later, he told the Massachusetts State Police that Detective Slattery had reminded him of his Miranda rights and that he told him [Detective Slattery] that he had understood those rights. The Massachusetts State Police went even further, however, by re-advising him of his Miranda rights (at approximately 7:50 p.m.) and again the defendant acknowledged that he understood his rights and waived those rights.
The interview with the Maine State Police lasted from 4:50 p.m. to 6:18 p.m. During the later part of that interview the defendant stated that he had a headache and that he felt sick to his stomach. He also stated that “I keep seeing her [referring to the victim’s] face.” Thereupon, the Maine State Police asked the defendant if he would like anything and the defendant responded “some water please." The defendant was provided with water. Soon thereafter, a North Berwick police officer asked the defendant how he was doing and the defendant responded “alright." By 6:18 p.m. the interview concluded and the Massachusetts State Police had arrived at the North Berwick police station.
Detective Slattery reviewed his interview (and played the tape of the interview) with Massachusetts State Police Lieutenant John Malone. At 7:50 p.m. Massachusetts State Police began their interview. Massachusetts State Police again taped the interview. Near the beginning of the interview, Massachusetts State Police Sergeant Malone re-advised the defendant of his Miranda rights and again the defendant unequivocally responded that he understood those rights *564 and that he wished to talk to the Massachusetts State Police. The interview covered much of the same ground that the Maine State Police interview had covered. Again, throughout the interview, the Massachusetts State Police engaged in questioning that was respectful in tone and professional in nature. The defendant’s responses were appropriate and sensible. The defendant’s voice was soft but it did range in tone from time to time. The defendant’s responses to questions were consistent with his responses to the earlier questions asked to him by the Maine State Police. Near the end of the interview, the defendant was asked once again about initially being told his rights by the North Berwick police. Again, the defendant responded, “the Sergeant read me my rights.” The defendant also stated that he had told the Sergeant that he understood those rights and that the Sergeant had read those rights from a card. The interview concluded at 8:35 p.m.
At approximately 9:00 or 9:30 p.m., one of the North Berwick police officers brought pizzas back to the station for the police officers and for the defendant. The defendant ate pizza and drank a soda at that time. At approximately 10:35 p.m. the defendant was transported to the York County Jail whereupon he was asked a series of admission/booking questions. In response to those questions, the defendant responded that he had attempted to commit suicide in the past (including on that day) but that he was not contemplating suicide at the present time. As was typical in light of such a response, the jail officials requested that the North Berwick police transport the defendant to the Southern Maine Medical Center for evaluation. That was done and an interview was conducted by a doctor at the Southern Maine Medical Center.
At the conclusion of this interview (which lasted nearly an hour) the doctor determined that the defendant was not suicidal but that he should be held in an area that permitted close observation and isolation. There is no reason to doubt the finding that the defendant was not suicidal at that time. By approximately midnight, the defendant had been transported back to the County Jail.
A Doctor Helen Presskreisch, a clinical psychologist, was called as a witness for the defendant. Dr. Presskreisch has conducted a series of interviews of the defendant which totaled 7-8 hours. She opined that the defendant is competent to stand trial and was capable of being criminally responsible at the time of the killing. It is her opinion, however, that while the defendant understood the meaning of his Miranda Rights when they were read to him and while he understood the concept of not speaking and the concept of choosing not to speak at the time his rights were read to him, the defendant was not able (due to his mental condition at the time) to fully understand the consequences of waiving his Miranda Rights. The doctor stated that the defendant had a clinical diagnosis of depression at the time that he was asked to waive his Miranda rights. The diagnosis was an “adjustment reaction with depressed mood.” In layman’s terms this meant that the defendant was adjusting or reacting to his violent crime with greater strength or emotion than the majority of individuals would react having killed a loved one. This resulted in the defendant being depressed to the point of contemplating suicide. The doctor stated, the defendant’s suicidal thoughts and attempts were more intense then what she had observed with other people who had committed similar crimes. As a result, Doctor Presskreisch opined that the defendant did not have a rational understanding of the negative consequences of speaking to the police. She explained that, at the time the defendant spoke to the police, he never anticipated going to trial. Instead, he fully expected to commit suicide sometime before the trial (although not on that day). Dr. Presskreisch also stated that the defendant’s lack of food intake and lack of sleep in the last twenty-four hours “did not help” his mental condition at the time. The Doctor admitted, however, that those factors were not as important as his mental state at the time.
I accept a portion of Dr. Presskreich’s testimony. As the defendant repeatedly stated, he did understand the Miranda rights that were repeatedly read to him. He understood the concepts of having the right not to speak, the right to an attorney, the right to have an attorney appointed to him should he not be able to afford one, and the concept that anything he said could be used against him at a trial. He also had the mental capacity to choose between speaking or not speaking. I accept the Doctor’s diagnosis that the defendant was depressed at the time he waived his Miranda rights and spoke to the police. Furthermore, the defendant, at the relevant time, was considering the possibility of suicide sometime in the future. I find, however, as did the medical professionals at the Southern Maine Medical Center, that he was not suicidal at the time. I agree with Dr. Presskreich that the defendant’s short amount of sleep (approximately 3 hours of sleep in the past twenty-four) and the limited amount of food intake (the defendant consumed breakfast prior to being questioned by the police but did not have a chance to eat dinner until after the questioning) did not “help” his mental state. But, I find that these factors did not have any significant effect upon the defendant. Neither his lack of sleep or lack of food intake were extreme. Indeed, as Lieutenant Malone testified, the defendant had eaten more on June 3rd than the Lieutenant had at the time of the interview.
The defendant was alert and oriented at all times during the police questioning. He suffered from no memory deficits, and he exhibited rational behavior in response to all questions asked of him. The defendant knew what actions he had done, he understood his *565 circumstances, he understood who he was and where he was. The defendant also, prior to receiving the Miranda warnings and waiving his rights, had exhibited the ability to make various important decisions, such as the decision not to kill himself or to use a gun in front of his nephew, and also the conscious decision to turn himself in to the police. While sad and contemplating the possibility of suicide at some future time, there was nothing wrong with his intellectual functioning when he waived his Miranda rights.
The Doctor partially based her conclusion that the defendant did not understand the “legal consequences” of his action of waiving his Miranda rights based upon her later interview with the defendant where it became apparent that the defendant, upon reflection, regretted speaking to the police. Thus, the Doctor opined, that even though the defendant’s statements were voluntary (in that they were not the result of trickery, coercion, or similar types of interrogation), the defendant could have no rational understanding of the negative legal consequences of speaking.
CONCLUSIONS OF LAW
I find beyond a reasonable doubt that the defendant was carefully read his Miranda rights on two occasions. Before any questioning by the police, the North Berwick Maine Police Sergeant Leo Harriman carefully went through each of the defendant’s Miranda rights and the defendant fully understood those rights, at the time, and, at the time, explicitly agreed to waive those rights and to speak with the police. The Miranda rights were reiterated by the Massachusetts State Police later on in the evening. Again, the defendant fully understood those rights and again agreed to waive his Miranda rights and voluntarily speak to the police. At set forth above, I do not find that the defendant at any time expressed a desire to have the Miranda warnings re-explained to him and I find, at no time, were the police under an obligation to provide any further explanation of his Miranda rights.[1]
I also find, beyond a reasonable doubt, that when the defendant waived his Miranda rights, he fully understood what he was doing and he fully comprehended those rights. Under the totality of the circumstances, the defendant’s waiver of his Miranda rights were, beyond a reasonable doubt, knowing and voluntary. The defendant’s conduct was consistent throughout the entire day; namely, he announced a desire to turn himself in and voluntary cooperate. He did so. All of his responses were intelligent and responsive to any question that he was asked. He was repeatedly informed of his Miranda rights and repeatedly waived those rights. The defendant, in his thirties, was a mature individual with a high school education. He was fully oriented at the time and alert. I find that there is absolutely no evidence to indicate that his earlier consumption of alcohol and drugs had any effect upon the defendant. He was sober at all times. There was no doubt that the defendant was upset and depressed at the time that the he made his statements to the police. It is also true, while not suicidal at the time, the defendant was contemplating the possibility of suicide in the future. While it is true that statements obtained solely as a result of the “effects of mental impairment” are not admissible and should be suppressed, Commonwealth v. Benoit, 410 Mass. 506, 515 (1991), the mere fact that someone is depressed or contemplating the possibility of future suicide at the time he decides to cooperate with the police does not render the waiver of his Miranda rights involuntary. See Commonwealth v. Perrot, 407 Mass. 539, 543 (1990). In the Perrot case, the defendant was placed on a suicide watch and was in a depressed state of mind during his contacts with the police. This, however, did not render him “incompetent to waive his rights and confess voluntarily.” As in the Perrot case, the defendant here was fully capable (as Dr. Presskreich agreed) of understanding his constitutional rights and fully understood the concept of waiving those rights. He expressed his desire to voluntary cooperate with the police. All of his responses were rational, consistent, and in accord with one who has decided to make a clean breast of matters and confess to the police.
This is a far cry from the situation involved in a case relied upon by the defendant, namely Commonwealth v. Hosey, 368 Mass. 571 (1975). In Hosey, unlike in this case, the defendant was apparently under the influence of alcohol (having been arrested for drunkenness shortly before being interrogated). The defendant in Hosey was illiterate and “extremely emotional.” The police also observed that he was “detached from reality.” Furthermore, correct Miranda procedures were not followed. Here, on the other hand, correct Miranda procedures were followed not once but twice. The defendant was sober at all times. The defendant was placed in comfortable rooms and provided with cigarettes and cold drinks. Although the defendant complained once of a headache and once of nausea, he was overall in good physical order and in a condition to be expected of one who had just committed such a killing. The interrogation that was conducted was respectful in tone and professional at all times. No trickery was used at any time. See Commonwealth v. Selby, 420 Mass. 656, 663 (1995).
Of course, in order to be valid, the waiver of Miranda rights must only not be the product of free and deliberate choice, “rather than intimidation, coercion or deception” but also “the waiver must have been made with the full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.” Moran v. Burbine, 475 U.S. 412, 421 (1986). The defendant’s own witness agreed to the defendant’s “full awareness” of the “nature of the right *566 being abandoned.” Further, the evidence is clear that the defendant made a deliberate choice (free from intimidation, coercion or deception) in waiving those rights. The defendant, however, hangs his hat of a language in Burbine that the defendant must also be aware of “the consequences of the decision to abandon” his Miranda rights. Citing Dr. Presskreich’s testimony, the defendant argues that he had no ability to comprehend the negative legal consequences at trial of confessing because he thought the confession would never be used against him as he would be dead before trial.
This Burbine language, however, has never been interpreted to its broadest extent. For example, the police never have been required to explain all possible legal ramifications of a statement to a suspect. Oregon v. Elstad, 470 U.S. 298, 316 (1985); Commonwealth v. Cunningham, 405 Mass 646, 657 (1989). Likewise, the police have no requirement to inform the defendant of his status in the investigation (e.g. whether he is prime suspect or not). Commonwealth v. Raymond, 424 Mass. 382, 393 (1997). “No doubt the additional information would have been useful to [the] respondent; perhaps even it might have affected his decision to confess. But we have never read the constitution to require that the police supply a suspect with a flow of information to help him calibrate his self interest in deciding whether to speak or stand by his rights.” Moran v. Burbine, supra at 422. The fact that the defendant thought he might not be around for the trial (because he was still contemplating suicide sometime in the future at the time he spoke to the police) does not change the conclusion. Undoubtly, upon further reflection, and upon consultation with his attorney, the defendant did regret speaking to the police and providing a full confession. This was one of the factors relied upon by Dr. Presskreisch in forming her opinion. This type of later regret, however, does not invalidate a knowing waiver or render his statements involuntary. Cf. Commonwealth v. Shipps, 399 Mass. 820, 827 (1987). At heart, a suspect does not have to fully comprehend all the detailed legal reasons why a statement of his might be against his best legal interests at the time that he voluntarily answers questions in custody. To ingraft such a requirement on a “voluntary” waiver of Miranda rights would be contrary to numerous of the cases cited above and would rendered almost any inculpatory confession inadmissible.[2]
The fact that one does not believe that a trial will actual go forward in a matter does not rendered one’s waiver of his Miranda rights involuntary. The defendant fully understood his rights, plainly wished to confess, fully comprehended that he had no obligation to do so, and voluntarily went ahead and did confess. He did this not only once but twice. He understood that the confession incriminated him in the killing of his girlfriend. To this extent he knew the consequences of speaking, i.e. the police would have incriminating evidence from his own mouth. Nothing more is required for a valid waiver of the defendant’s Miranda rights. If one were to accept the defendant’s reasoning, any waiver by a suspect who is seriously wounded or believes he may have contracted a serious disease or is convinced he will escape prior to trial would be rendered involuntary.
Although the waiver of Miranda rights and the determination of voluntariness present separate issues, they both concern the defendant’s state of mind, his understanding, and related matters. Commonwealth v. Sires, 413 Mass. 292, 307 (1992). Again, this court finds, by a standard beyond a reasonable doubt, that the defendant’s statements to the police were voluntary. As set forth above, the defendant plainly understood that he was not required to speak, but he wished to do so. Although the defendant may have been depressed at the time he spoke, he was alert, sober, full oriented, and understood what he was doing. Despite a small amount of sleep, and a limited amount of food, the defendant was in good physical shape when he spoke. The police engaged in no sort of trickery or strong arm tactics. The defendant’s will was not overborne in anyway. The defendant’s confessions were, beyond a reasonable doubt, voluntary.
CONCLUSION
For the reasons set forth above, the defendant’s motion to suppress is denied.

Even had the defendant unequivocally asked for further explanation of his Miranda rights, there is no reason to suppress the later interview by the Massachusetts State Police (which was preceded by a reiteration of defendant’s Miranda rights). Even though the two interviews covered similar ground, the Massachusetts State Police interview was not a product of the Maine State Police interview. Instead, it was a continuation of the defendant’s ongoing attempt to explain and confess to his conduct. This attempt began with the suicide note, then his statements to his family, and, later, confessions to the police.

It should also be remembered that the defendant is not alleging that the police engaged in any sort of misconduct or that his statement is somehow untrustworthy due to the circumstances of the waiver. Indeed, given Dr. Presskreich testimony, it appears that the defendant’s statements bear strong indicia of reliability. If one was to fully accept the Doctor’s testimony, which this Court does not, the defendant made these statements wanting to confess and recognizing that he was soon going to commit suicide, believed these statements would not be evidence at any trial. For the same reasons that dying declarations, suicide notes, or excited utterances bear indicia of reliability, these statements bear the same indicia of reliability. The defendant had absolutely no motive to fabricate at the time he confessed. It is difficult to conceive what beneficial societal purposes would be achieved by suppressing such statements.