NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-851

COMMONWEALTH

vs.

JONOVAN GONZALEZ.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A grand jury indicted the defendant for murder, G. L. c. 265, § 1, and two firearms offenses.[1] The defendant moved to suppress (1) cell site location information (CSLI)[2] that police received in response to a warrantless request of the defendant's cell phone provider; and (2) evidence derived from the CSLI, namely, the location of the defendant's 2003 Toyota Corolla and various surveillance video recordings depicting the vehicle

---

[1] Carrying a firearm without a license in violation of G. L. c. 269, § 10 (a), and carrying a loaded firearm without a license in violation of G. L. c. 269, § 10 (n).

[2] See, e.g., Carpenter v. United States, 585 U.S. 296, 301 (2018) ("Each time [a] phone connects to a cell site, it generates a time-stamped record known as cell-site location information [CSLI]").

driving on public roads. After hearing testimony from nine witnesses and considering numerous video recording, photographic, and documentary exhibits, a Superior Court judge allowed the motion. A single justice of the Supreme Judicial Court thereafter allowed the Commonwealth's application for leave to file the instant interlocutory appeal "limited to the issue of inevitable discovery." After review, we agree with the motion judge that the Commonwealth failed to establish that the car and video recordings inevitably would have been discovered. Accordingly, we affirm.

Background. We recite the facts as found by the motion judge, none of which are disputed by the Commonwealth, adding details supported by the record as relevant. See Commonwealth v. Kaplan, 97 Mass. App. Ct. 540, 541 n.3 (2020), quoting Commonwealth v. Jessup, 471 Mass. 121, 127-128 (2015) ("We recite the facts found or implicitly credited by the motion judge, supplemented by additional undisputed facts where they do not detract from the judge's ultimate findings").

Shortly before 10 P.M. on August 11, 2020, New Bedford police officers became aware of a shooting resulting in death. The defendant developed as a suspect, and officers were able to identify a car, registered to the defendant, that somewhat matched eyewitness descriptions relayed at the scene. A "be on the lookout" warning issued locally to officers in the field and

2

to other police departments identifying the defendant's car by make, model, and registration number.

Alongside interviewing witnesses and canvassing parts of the city for the car and murder weapon, the police dedicated investigative resources to "chasing video," a process by which officers followed the vehicle's likely path of travel, tried to identify homes or businesses with cameras that might have captured the vehicle going by, and asked the proprietors (if they could be contacted) to share the video recordings to help solve the crime. An eyewitness described the direction the vehicle headed after the shooting, so investigators started the process by searching for video recordings in that area.

The next day, August 12, investigators requested and received eight video recordings that showed the vehicle traveling past stores and homes. One of the video recordings that the officers requested was not supplied until two days later, on August 14, when investigators went back to follow up and collect it. The video recordings eliminated certain paths of travel and, together with the officers' detailed knowledge of the topography and road layout in the area, made certain paths of travel much more likely. Also on August 12, the defendant came by the police station for an interview during the 11 A.M. hour, was turned away, and returned at 3:30 P.M., whereupon he was arrested on an outstanding warrant. Although the defendant

3

would remain in custody, the police would later learn that someone else had had a set of keys to the car all the while.

At 10:43 A.M. on August 13, a State police trooper submitted an "Emergency Situation Disclosure" form to Verizon requesting thirty-six hours of the defendant's CSLI.  The form explained that the information was requested to assist with an "Active Homicide Investigation by Firearm @ Large."  The trooper received the requested CSLI in response at 12:40 P.M. of the same day, which he then analyzed with a software program to visualize the defendant's movements throughout the relevant time.  At 3:29 P.M. on August 13, the trooper sent an e-mail to "[a]ll the case investigators that were actively working on the case from the New Bedford Police Department and the Bristol CPAC unit" telling the investigating officers where to look for the car.  The trooper sent another e-mail at 10:38 A.M. on August 14 with a map and more detailed information.

Also on August 14, the investigating officers recovered more surveillance video recordings.  One of the video recordings depicts the suspect car passing "Dartmouth Gas" and turning onto Cove Road, which greatly narrowed the possible paths the car could have traveled.  The Superior Court judge ruled that the CSLI data led the officers to Dartmouth Gas.

An officer in the field received the trooper's August 14 e-mail.  The target area was west of where the officer was

4

looking, in a place that had already been searched. The officer went to St. John Street and saw the car in plain view in a driveway at around 11 A.M. At or around the time the car was discovered, another officer requested and later received footage showing the car entering the place where it was discovered parked. The form denoting when that footage was collected is the only form in the record that does not list a time of collection.

Testimony showed that the investigative team worked as a cohesive unit. The trooper who collected the CSLI data agreed that there was a collaborative effort to combine what each investigator had collected. Not only did he share his findings as they came in with the entire team via e-mail, he also testified that the other investigators were "sitting over [his] shoulder, and [they] were [looking at the data] together." The officers also uniformly testified that the CSLI data affected the way they investigated the case. One officer testified that having CSLI makes "chasing video" easier because investigators can identify the vehicle's end point and collect surveillance footage from both directions. One officer wrote in his report that the investigators used the CSLI data to find the vehicle. The officer who ultimately located the vehicle testified that "[o]nce I got the CSLI data, I found the vehicle shortly after." In an affidavit in support of a search warrant in the case, an

officer averred that the CSLI data helped develop areas of interest, both by identifying certain areas and confirming areas that had already been developed.  The officer elaborated that the team used the CSLI in their search for the car.

Discussion.  In reviewing a ruling on a motion to suppress, "we adopt the motion judge's factual findings absent clear error," Commonwealth v. Isaiah I., 450 Mass. 818, 821 (2008), and "conduct an independent review of his ultimate findings and conclusions of law." Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002).  "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." Commonwealth v. Campbell, 475 Mass. 611, 615 (2016).

There is no dispute that a warrant was required to obtain CSLI data in this case; at the time of this August 2020 search, the law on that point was clear.  See Commonwealth v. Estabrook, 472 Mass. 852, 858 (2015).  See also, e.g., Commonwealth v. Jeune, 494 Mass. 808, 815 (2024) (CSLI obtained pursuant to warrant showed defendant's presence at three hotels, where his distinctive car was seen on security video recordings).  The Commonwealth sought to avoid suppression of evidence seized without a warrant by, relevant here, showing that the evidence inevitably would have been discovered even without the CSLI data.  See Nix v. Williams, 467 U.S. 431, 444 (1984)

6

("inevitable discovery" excuses failure to seek necessary warrant where police would have obtained evidence if no misconduct had taken place). In Massachusetts, the exception requires the Commonwealth to prove by a preponderance of the evidence, see Commonwealth v. O'Connor, 406 Mass. 112, 117 (1989), that "discovery of the evidence by lawful means was certain as a practical matter, the officers did not act in bad faith to accelerate the discovery of evidence, and the particular constitutional violation is not so severe as to require suppression [quotation omitted]." Commonwealth v. Hernandez, 473 Mass. 379, 386 (2015). Discovery must be "virtually certain." Commonwealth v. Perrot, 407 Mass. 539, 547 (1990). "In addition, the discovery must have been inevitable under the 'circumstances existing at the time of the unlawful seizure.'" Campbell, 475 Mass. at 622, quoting Perrot, 407 Mass. at 548. This is a "demanding test." Commonwealth v. Balicki, 436 Mass. 1, 16 (2002), quoting Perrot, supra at 548.

Here, because all members of the investigative team knew "at least some of the critical facts" of the investigation, the law imputes knowledge of the CSLI data's collection to all the investigating officers, even if they testified that they were unaware of the data's contents. See Commonwealth v. Privette, 491 Mass. 501, 508, 513 (2023). Moreover, the evidence amply supported the judge's

7

finding that knowledge of the CSLI data impacted the way investigators approached the case, taking steps they would not otherwise have taken.

Furthermore, the judge did not err in finding that the Commonwealth failed to prove that it would inevitably have found the car without knowledge gleaned from the CSLI data. The car was found in an area that the officers had already searched without finding the car. Unlike in the seminal Nix case, where a search team was going to scour culverts for a body but merely had not reached the relevant area when the initial search was called off, 467 U.S. at 436, 448-450, in the present matter there was no telling how long it would have taken officers to "chase [enough] video" to realize that they needed to double back. See Perrot, 407 Mass. at 545-548 (discovery not inevitable when pocketbook was almost in plain view in heavily searched area without being discovered). In fact, there was some evidence that the officers had gone off in the wrong direction.

Once the investigative team had the CSLI data, the team followed up with a proprietor from whom they were able to retrieve (on August 14) a video recording initially requested on August 12; yet, the testimony in the case was that video recordings sometime overwrite quickly, or are

8

otherwise unavailable shortly after creation.  There is no guarantee that, by the time the officers realized such video footage was important and went to retrieve it, the video footage would still have been intact.  Without the CSLI data, the officers might have taken much longer to get on the right track, and by then the video recordings might have been inaccessible.

Moreover, even if we assume that the police's arrival at St. John Street was inevitable, the car's discovery was not a foregone conclusion.  The testimony demonstrated that another person had a set of keys to the car.  The Commonwealth did not put on any evidence describing who that person was, explaining why the car was parked where it was, or accounting for whether the person with the other set of keys knew or could have known the car's location.  A key assumption of many Fourth Amendment cases is that cars are inherently mobile.  See, e.g., Carroll v. United States, 267 U.S. 132, 153 (1925).

We are not assured that the car would have been where the in-custody defendant left it when the officers eventually arrived at St. John Street, if they ever did.  And if the car had gone somewhere else before investigators arrived, there is no telling whether officers could have "chased video" to any of the places that it thereafter

9

could have gone.  Each time the car passed an intersection, the officers either would have had to obtain video footage of the car going through that intersection or else find video footage from each intersecting street to eliminate it as a viable path.  In just a handful of intersections, this would have required the officers to pull an impracticable number of video recordings, all of which may not have existed or might have been rewritten shortly after collection or be otherwise inaccessible.  There is no guarantee that a given road would have any operable cameras, and to guess that the car's discovery might be inevitable at such a point would be pure speculation.  At such a point, as one officer testified, the officers would just have to scour the city for video footage at random and hope to "get lucky."  Nothing about this plausible outcome would render the relevant video recordings' collection certain as a practical matter.

Lastly, while the inevitable discovery exception is concerned with "putting police in the same, not a <u>worse</u> position [than] they would have been in if no police error or misconduct had occurred" (footnote and citations omitted), <u>Nix</u>, 467 U.S. at 443 (analogizing to the closely related independent source doctrine); see <u>O'Connor</u>, 406 Mass. at 114, the cases require us to consider the severity

10

of the constitutional violation at issue, even if the evidence would inevitably have been discovered. See O'Connor, supra at 118. Here, the law was well established, the police had time to get a warrant, the defendant was in custody, and the warrantless information collected implicates sensitive privacy concerns. See Carpenter, 585 U.S. at 312 (discussing how CSLI technology could allow for "tireless and absolute surveillance"). To the extent this is a close case (especially with respect to the surveillance video recordings), suppression is justified because the need to ensure compliance with the law, see Commonwealth v. Webster, 75 Mass. App. Ct. 247, 259 (2009) (exclusionary rule exists in part to deter police misconduct), is stronger than the need to avoid punishing society for police mistakes under the facts as here presented to us. See Nix, 467 U.S. at 447, quoting People v. Defore, 242 N.Y. 13, 21 (1926) (lamenting that it

11

is a shame if a "criminal is to go free because the constable has blundered").

Order entered March 8, 2023, allowing motion to suppress, affirmed.

By the Court (Massing, Singh & Grant, JJ.[3]),

Paul Little

Clerk

Entered: December 13, 2024.

---

[3] The panelists are listed in order of seniority.

12