COMMONWEALTH *vs.* BENNIE HOSEY.

Hampden.    May 5, 1975. — September 9, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Constitutional Law*, Waiver of constitutional rights, Admissions and confessions. *Waiver. Evidence*, Admissions and confessions.

Following a voir dire respecting the admissibility at a trial for statutory rape of a statement made in the absence of counsel by the defendant to police about 5 A.M. on the morning of the crime after he had been arrested for drunkenness and given the warnings required by *Miranda* v. *Arizona*, 384 U. S. 436 (1966), a conclusion by the judge that "there was an intelligent waiver" by the defendant of his constitutional rights was error as matter of law where it appeared that the police were aware when the statement was made that the defendant was "extremely high," "extremely emotional," and "detached from reality," and that police put the

burden on him to "insist" on a lawyer [573-579]; the error was not harmless beyond a reasonable doubt since the statement impeached the defendant's trial testimony, which denied any involvement in the crime, and the evidence of his guilt was entirely circumstantial [579].

INDICTMENT found and returned in the Superior Court on January 4, 1973.

The case was tried before *Moriarty,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*William A. Nelson* for the defendant.

*William W. Teahan, Jr.,* Special Assistant District Attorney, for the Commonwealth.

REARDON, J.   This is an appeal under the provisions of G. L. c. 278, §§ 33A-33G, from a conviction of statutory rape (G. L. c. 265, § 23) after a jury trial in the Superior Court in Hampden County.   Following proceedings under G. L. c. 123A, the defendant was found to be a sexually dangerous person.   On June 7, 1973, he was sentenced to a term of fifteen to twenty years in the State prison.

The incident which gave rise to the proceedings occurred in the early morning hours of November 3, 1972.   The victim was the two year old daughter of one Alice Lupien, with whom the defendant had been living at her home in Chicopee for a period of some seven or eight months.   The defendant's peregrinations on the night of November 2 need not be recounted in any great detail other than to note that a considerable amount of liquor appears to have been consumed during their course. It appears that Mrs. Lupien spent the latter part of the evening at a friend's house in Holyoke, and that around midnight the defendant and one Ted Chalmers, a friend of Mrs. Lupien's neighbor Sandra Headlee, drove through Holyoke searching for Mrs. Lupien.   Unable to find her, Chalmers and the defendant returned to Chicopee about 12:30 A.M. on November 3, 1972.

There was conflicting testimony as to the events which followed. Chalmers and Sandra Headlee testified that the defendant next stopped in at Mrs. Headlee's house and had two drinks before arriving at Mrs. Lupien's house at 12:45 A.M. Some thirty minutes later the defendant returned to Mrs. Headlee's apartment exclaiming that he needed help, that something had happened to Mrs. Lupien's daughter Julie. Blood was observed on the defendant's trousers at this time. Mrs. Headlee went next door to investigate and discovered that Julie had been injured. Soon thereafter Alice Lupien returned from Holyoke, and about ten minutes later the police arrived.

By the defendant's account, when he and Chalmers returned home at 12:30 A.M. Mrs. Headlee was standing in her doorway yelling that Julie had been injured. The defendant talked with Chalmers outside for awhile and then entered the Lupien home. He picked up the child and then noticed that he had gotten blood on his trousers. The defendant next called the police, who arrived about the same time as Mrs. Lupien.

Two police officers entered the Lupien home between 2:20 and 2:25 A.M. They concluded that the child needed immediate medical attention and so drove her, along with Mrs. Lupien and a second daughter Jennifer, to the Holyoke hospital. The defendant arrived at the hospital by taxicab some twenty-five minutes later. A medical examination of the child revealed that there had been forceful penetration of the vagina.

While awaiting the results of the examination two police officers observed the defendant in the waiting room yelling and swearing at Mrs. Lupien. After attempting to quiet him they placed him under arrest for drunkenness and disturbing the peace. At 4:25 A.M. he was taken to the Chicopee police station.

The single issue in this case is the admissibility of a statement given to the police by the defendant on November 3 after his arrest. The statement was made in the

absence of counsel but after he had received *Miranda* warnings. Thus we are concerned with whether the defendant "voluntarily, knowingly and intelligently" waived effectuation of his constitutional rights. *Miranda* v. *Arizona,* 384 U. S. 436, 444 (1966). A voir dire on this question was held during the trial when it became apparent that Sergeant Bartholomew Sullivan of the Chicopee police department would testify to the content of the defendant's statement. The Commonwealth produced two witnesses only at the voir dire, Sergeant Sullivan and Captain Charles J. Tutty, both of whom were present at the interrogation of the defendant on November 3. The judge made no findings of fact but concluded that, on the basis of the testimony of Sullivan and Tutty, "there was an intelligent waiver." We have reviewed this testimony carefully and are of opinion that as matter of law the judge was not warranted in reaching his conclusion.[1] A full description of the voir dire testimony is necessary here for it is our obligation to examine the totality of circumstances leading up to the waiver, including the conduct and characteristics of the

---

[1] Had there been subsidiary findings of fact by the trial judge they would have been accepted by this court absent clear error, but the ultimate legal conclusion to be drawn from the facts developed at the voir dire is a matter for review by this court, particularly where the conclusion is of constitutional dimensions. *Commonwealth* v. *Murphy,* 362 Mass. 542, 550-551 (Hennessey, J., concurring) (1972). See *Commonwealth* v. *Murray,* 359 Mass. 541, 546 (1971). In a number of cases involving factual issues which were the subject of voir dire hearings in the trial court but on which the judge made no express findings of subsidiary facts, we remanded the cases to the trial court with instructions that the judge make such findings and report them to us. However, because of our conclusion that the evidence in this case, in its light most favorable to the Commonwealth, is insufficient to support a finding, whether express or implied, that "there was an intelligent waiver," no useful purpose would be served by remanding the case for findings on this factual issue. The insufficiency of the evidence distinguishes this case from *Commonwealth* v. *Tempesta,* 361 Mass. 191 (1972), *Commonwealth* v. *Murphy,* 362 Mass. 542 (1972), and *Commonwealth* v. *Brown,* 364 Mass. 471 (1973), which we remanded for such findings following the decisions

accused and the details of the interrogation. *Commonwealth* v. *Daniels*, 366 Mass. 601, 606-607 (1975). See *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938); *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 226 (1973).

It appears that the defendant arrived at the Chicopee police station about 4:25 A.M., having been arrested at the Holyoke hospital for drunkenness at approximately 3 A.M. After completion of the booking procedure the defendant attempted to make a telephone call but received no response. Captain Tutty then approached the defendant and asked him if he would talk to the police "about an assault on a child." The defendant answered, "[Y]eah, man, let's talk." He was taken upstairs to the juvenile bureau where he was given a cup of coffee. Sergeant Sullivan testified to the defendant's condition in no uncertain terms. The defendant appeared to him "extremely emotional, extremely high," and "abnormal." He was "doing a great deal of motioning, right on, man, that's it, man"; in other words, he "wasn't making much sense." The conversation was "a haphazard thing." Sergeant Sullivan's judgment that he was high on something was based on "his actions," "[t]he way he talked," and "the fact that he was detached from reality, so to speak." There was "definitely" "something wrong with him." Though he had no trouble walking, his speech ran together. Not until after an hour and a half of interrogation and three cups of coffee was he "kind of simmering down." Captain Tutty did not go quite so far in describing the defendant's condition, stating that he thought that the defendant was not drunk but was "under the influence of something," alcohol or drugs, or was physically ill.

---

in *Cooper* v. *Picard*, 428 F. 2d 1351 (1st Cir. 1970), and *Cooper* v. *Picard*, 316 F. Supp. 856 (D. Mass. 1970), granting habeas corpus after our decision in *Commonwealth* v. *Cooper*, 356 Mass. 74 (1969), in a situation where the judge of the Superior Court had not made subsidiary findings of fact.

A period of about fifteen minutes elapsed before the *Miranda* warnings were given. During this time the defendant "kept rambling on and on about things, we went drinking, we went here and there, and so forth." He also told the police he hoped they "would hurry up and get this over with, that he had a job to go to, he had to be there . . . at 6.00 o'clock in the morning, and he was rambling on in this trend."

The standard *Miranda* warnings were then given to the defendant with one variation. While Sergeant Sullivan read the warnings from a card, Captain Tutty interjected that "it was about 5:00 in the morning and it would be tough to get . . . [a lawyer], but if he insisted . . .." Sergeant Sullivan also read a form waiver to the defendant and asked him if he would like to sign a waiver. The defendant answered that "he didn't think it would be of any use because he said he neither reads nor writes." Sergeant Sullivan then asked if he would like to talk about the events leading up to his being taken to the police station. The response was, "[R]ight on, man, let's talk about it. This is what I want to do, I want to talk about it. Let's get this over with." As to the problem of getting an attorney at that hour, he said "he didn't need a lawyer and he would talk to us." The defendant thereupon gave a statement to the police which differed in some respects from his testimony at trial and which contained certain inculpatory elements despite its generally exculpatory nature.

In *Miranda* v. *Arizona,* 384 U. S. 436, 475 (1966), the Supreme Court set out the test for waiver as follows: "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. . . . This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson* v. *Zerbst,* 304 U. S. 458 (1938), and we reassert these

standards as applied to in-custody interrogation." It was emphasized in *Johnson* v. *Zerbst, supra,* at 464, that "'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights." Based on the evidence adduced at the voir dire, we cannot say that the Commonwealth's heavy burden was met in this case.[2]

One factor weighing against a finding of waiver is the physical and emotional condition of the defendant during the interrogation. The police were aware that the defendant had been brought to the station under arrest for drunkenness. See *Logner* v. *North Carolina,* 260 F. Supp. 970, 976 (M. D. N. C. 1966), cert. den. 393 U. S. 857 (1968). Cf. *Commonwealth* v. *Rollins,* 354 Mass. 630, 635 (1968). Sergeant Sullivan's own observations were that the defendant was "extemely high," "extremely emotional," and "detached from reality." See *Commonwealth* v. *Cain,* 361 Mass. 224, 228-229 (1972). Thus the police were well aware that something was wrong with the defendant, that he was not behaving normally.

Knowing what they did, the police should have been sensitive to whether the defendant was genuinely in a position to understand the significance of a waiver of his rights, in particular the importance of having a lawyer with him during the interrogation. See *Miranda* v. *Arizona, supra,* at 469-472; *United States* v. *Miller,* 453 F. 2d 634, 636 (4th Cir. 1972), cert. den. 406 U. S. 923 (1972). Instead, the police gratuitously indicated to the defendant that it would be difficult to get a lawyer at

---

[2] We need not address ourselves to whether, as argued by the Commonwealth, this burden may be met by a demonstration of waiver by a mere "preponderance of the evidence," see *Commonwealth* v. *Roy,* 2 Mass. App. Ct. 14, 18 (1974); *Lego* v. *Twomey,* 404 U. S. 477, 489 (1972), or whether, as the defendant contends, a more exacting standard is required. Even under the first test, we are not persuaded that the preponderance of the evidence does in fact demonstrate a valid waiver of *Miranda* rights.

that hour though his right could be exercised "if he insisted." The police knew that the defendant felt the need to finish the interrogation quickly so he would be able to get to work on time, and in making this statement they appear to have encouraged a waiver, putting the burden on the defendant to "insist" on a lawyer. We do not go so far as to say that the defendant was "threatened, tricked, or cajoled into a waiver," *Miranda* v. *Arizona, supra,* at 476, though cajolery can take subtle forms. See *Williams* v. *Brewer,* 509 F. 2d 227, 230 (8th Cir. 1974). But in light of what the police knew about the defendant's physical and emotional condition, we cannot condone an attempt to induce a waiver in this manner. See Am. Law Inst. Model Code of Pre-Arraignment Procedure, § 140.4 (Proposed Official Draft 1975). We so state in the face of the fact that the police were working on a detestable crime and naturally sought its solution. Under these circumstances, when the defendant responded to a suggestion of waiver with "right on, man, let's talk about it," that response does not seem to us to evince "with sufficient clarity an understanding by the defendant of his fundamental rights and an intelligent waiver of those rights." *Commonwealth* v. *Cain, supra,* at 228. Cf. *Commonwealth* v. *Daniels,* 366 Mass. 601, 608 (1975). In fact, Sergeant Sullivan apparently reached the same conclusion upon hearing the defendant's response, as appears from the following colloquy with defense counsel: Q. "And that [the response to the suggestion of waiver] indicated to you he wasn't acting in a normal fashion, is that so?" A. "Right. It indicated he was really high on what, I don't know." Q. "There was something wrong with him." A. "Yes, definitely."

Having reviewed the voir dire testimony, we cannot say that "every effort" was made by the police to see to it that the defendant did not unknowingly relinquish basic constitutional protections indispensable to a fair trial. *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 242 (1973). When the police became aware that the defendant was

"extremely high," "extremely emotional," and "detached from reality," all questioning should have ceased until he was clearly capable of responding intelligently. See *Sample* v. *Eyman*, 469 F. 2d 819, 821 (9th Cir. 1972). There was testimony that he was "kind of simmering down" after an hour and a half at the police station and three cups of coffee; presumably sometime after that point interrogation could have proceeded. But particularly when a suspect is brought in on a charge of drunkenness the police should not assume they can immediately receive a knowing and intelligent waiver of *Miranda* rights and commence interrogation. Certainly in this case the "heavy burden" connected with demonstrating such a waiver cannot be said to have been met on the basis of the testimony of the two police officers.

The remaining question is whether admission of the defendant's statement to the police might be considered "harmless error." Apart from the statement there was substantial evidence pointing to the defendant as the perpetrator of this most reprehensible crime. But the evidence was entirely circumstantial and the defendant took the stand to deny any involvement in the incident. Although the statement to the police was generally exculpatory, it differed from his trial testimony in describing where he was when the injured child was discovered, and in the explanation offered for a bloodstain observed on his pants. The statement thus impeached his trial testimony and was "incriminating in any meaningful sense of the word." *Miranda* v. *Arizona, supra,* at 477. Also, the defendant had told the police that he had better "have a good story for the jury," further implying his guilt. For these reasons we are unable "to declare a belief that . . . [the error in admitting the statement] was harmless beyond a reasonable doubt." *Chapman* v. *California,* 386 U. S. 18, 24 (1967). Contrast *Milton* v. *Wainwright,* 407 U. S. 371 (1972). Accordingly, the judgment is reversed and the verdict is set aside.

*So ordered.*