NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

16-P-981                                          Appeals Court

COMMONWEALTH  vs.  RANDALL TREMBLAY.

No. 16-P-981.

Suffolk.     April 14, 2017. - September 25, 2017.

Present:  Trainor, Agnes, & Neyman, JJ.

Constitutional Law, Admissions and confessions, Voluntariness of
     statement, Waiver of constitutional rights, Search and
     seizure.  Evidence, Admissions and confessions,
     Voluntariness of statement, Videotape, Intoxication.
     Practice, Criminal, Motion to suppress, Admissions and
     confessions, Voluntariness of statement, Waiver, Findings
     by judge.  Waiver.  Intoxication.  Search and Seizure,
     Clothing.

Indictments found and returned in the Superior Court
Department on March 10, 2015.

A pretrial motion to suppress evidence was heard by Kenneth
W. Salinger, J.

Applications for leave to prosecute interlocutory appeals
were allowed by Geraldine S. Hines, J., and Robert J. Cordy, J.,
in the Supreme Judicial Court for the county of Suffolk, and the
appeals were reported by them to the Appeals Court.

Zachary Hillman, Assistant District Attorney (Amy J.
Galatis, Assistant District Attorney, also present) for the
Commonwealth.

Patrick Levin, Committee for Public Counsel Services, for the defendant.

AGNES, J.  The defendant, Randall Tremblay, was arrested and subsequently indicted for the murder of Stephanie McMahon, based on statements he made to the police both at the scene and in two subsequent custodial interrogations, and blood discovered on his clothing, which the police seized when they arrested him. The defendant moved to suppress all statements he made to the police and all evidence seized from him.  The judge conducted an evidentiary hearing, during which he heard testimony from three police officers and viewed a videotape recording of the second custodial interrogation of the defendant following his arrest on a warrant for an unrelated offense.[1]  Based on the contents of that videotape recording, the judge concluded that the defendant was so intoxicated when he was questioned at the police station that he was incapable of making a knowing and intelligent waiver of his Miranda rights.  As a result, the judge ruled that all of the statements made by the defendant at the police station must be suppressed.  The judge also ruled that while the police

---

[1] The exhibits admitted in evidence at the motion to suppress hearing include the following:  the defendant's signed Miranda rights form, the restraining order obtained by the victim against the defendant, the inadvertent videotape recording of the wrong interview room, the videotape recording of the defendant's second interview, photographs of items recovered from the dumpster behind the victim's apartment, and a videotape recording of a train platform depicting the defendant.

lawfully seized the defendant's clothing in order to preserve evidence of an apparent homicide, they acted unlawfully in subjecting the clothing to forensic testing without first obtaining a search warrant.  Therefore, the judge made a further ruling that all forensic testing results from the defendant's clothing must be suppressed.

For the reasons more fully explained in the discussion that follows, our independent review of the judge's ultimate finding that the defendant was too intoxicated to waive his rights leads us to conclude that it is erroneous.  See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).[2]  In addition, our independent review of the judge's ruling of law that the Commonwealth failed to meet its burden to prove a valid waiver of the defendant's Miranda rights leads us to conclude that it too is erroneous.  Finally, mindful of the limits on appellate fact finding, see id. at 438, we conclude that the unusual circumstances of this case brings it within the rule applied in Commonwealth v. Novo, 442 Mass. 262, 266 (2004), Commonwealth v. Hoyt, 461 Mass. 143, 148-151 (2011), and Commonwealth v. Newson, 471 Mass. 222, 231-232 (2015).  In those cases, the Supreme

---

[2] "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error but conduct an independent review of the ultimate findings and conclusions of law."  Commonwealth v. Jones-Pannell, supra (quotations omitted).  See Commonwealth v. Haas, 373 Mass. 545, 550 (1977); Commonwealth v. Alvarado, 420 Mass. 542, 544 (1995); Commonwealth v. Thomas, 429 Mass. 403, 405 (1999).

Judicial Court declined to defer to the factual findings made by the motion judge, conducted an independent review of a videotaped interrogation session, and determined whether there was compliance with the Miranda rights doctrine (Hoyt) and whether the statements were voluntary (Newson and Novo), without the need for a remand.  In the present case, the judge relied on the videotaped interrogation session to find the facts that led him to conclude that the defendant was too intoxicated to waive his Miranda rights.[3]  However, based on our independent review of the same documentary evidence, we conclude that there is ample evidence to support the conclusion that the Commonwealth met its "heavy burden," Commonwealth v. Hoyt, supra at 152, to establish that the defendant made a valid waiver of his Miranda rights, and that his statements were voluntary.

Background.  The following facts are drawn from the findings made by the judge, and testimonial evidence presented at the motion to suppress hearing that is consistent with those

_____

[3] The judge heard the testimony of three police officers in addition to viewing the videotape of the defendant's interrogation.  The judge was entitled to make credibility assessments and weigh that evidence, which we are not permitted to do.  Commonwealth v. Jones-Pannell, supra at 432.  However, as we explain, infra, the judge's subsidiary findings relating to his conclusion that the defendant was incapable of waiving his Miranda rights are not supported by the testimonial evidence.  In fact, the testimonial evidence is consistent with and supportive of the view we take of the videotape evidence.  Instead, the judge's conclusion that the defendant was too intoxicated to waive his Miranda rights is derived from the inferences he draws from the videotape evidence.

findings.  See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007).  We reserve certain details for our analysis of the issues raised on appeal.

1.  At the crime scene.  Shortly after 2:00 A.M. on November 18, 2014, Boston police Sergeant Scott Yanovitch arrived at an apartment in the Hyde Park area of Boston shortly after the victim, Stephanie McMahon, had been pronounced dead. Another officer and two emergency medical personnel were already on scene, after responding to a 911 call reporting that a woman had died in the apartment.  Sergeant Yanovitch requested that the police dispatcher issue a "full notification" for a crime scene team and homicide detective to come to the scene.  He then interviewed two witnesses who were present at the apartment when the police arrived, Michael Doucette and Gay Finley.[4]  At one point, Sergeant Yanovitch stepped outside for some fresh air. He observed a man, later identified as the defendant, walk past the apartment while talking and mumbling to himself.  Sergeant Yanovitch had no interaction with the defendant at that time. Later, Doucette asked to go outside and smoke a cigarette. Sergeant Yanovitch accompanied him.  While outside, Sergeant Yanovitch again observed the defendant walk by the apartment while talking to himself.  The defendant stopped and asked

_____

[4] We adopt the judge's spelling of Finley.

Doucette for a cigarette. Sergeant Yanovitch told the defendant to move along, but otherwise had no interaction with him.

At the time of dispatch to the victim's apartment, Boston police Officer Shawn Roberts was on patrol with his partner in a marked police cruiser. Officer Roberts recognized the address as one that he had previously responded to some months earlier for a report of a broken window. He was also aware of a number of incident reports related to that address, most of which were for domestic violence incidents between the victim and a man named Randall Tremblay. When Officer Roberts received the full notification from Sergeant Yanovitch, he looked up Tremblay and discovered that there was an active restraining order against Tremblay requiring him to stay away from the victim's apartment, as well as an active arrest warrant against Tremblay for failing to register as a sex offender. He also obtained a photograph of Tremblay. Officer Roberts contacted Sergeant Yanovitch and informed him of the previous domestic violence incidents between the victim and Tremblay and the active restraining order. Shortly thereafter, Sergeant Yanovitch radioed Officer Roberts and asked him to come to the scene to determine if Doucette, who did not have identification, was the person whom Officer Roberts had radioed him about. Officer Roberts arrived on scene and told Sergeant Yanovitch that Doucette was not Tremblay; Officer Roberts then left.

Later, around 3:40 A.M., Sergeant Yanovitch was inside the apartment when he heard loud yelling coming from the street outside. He went outside and discovered the defendant, who was yelling things like, "What's going on in there? I know what happened," and "She was my friend." The defendant approached Sergeant Yanovitch and asked him what was happening in the apartment and repeated that "she was [his] friend." Sergeant Yanovitch asked for the defendant's name, who replied, "What, are you going to run me?" Because the defendant had just suggested that he knew the victim and may have information about her death, Sergeant Yanovitch radioed Officer Roberts to return to the scene. Officer Roberts returned and informed Sergeant Yanovitch that the defendant was Randall Tremblay, and that he had an active arrest warrant. Officer Roberts placed the defendant under arrest and advised him of his Miranda rights.[5]

2. Unrecorded custodial interrogation. Officer Roberts and his partner brought the defendant to police headquarters to be interviewed. Beginning at around 4:00 A.M., Sergeant Detective Michael Stratton interviewed the defendant in an interview room. Sergeant Detective Stratton believed that the interview was being recorded, but the recording equipment was

---

[5] The judge found that the defendant did not acknowledge whether he understood his rights, but as the defendant was not questioned until later at the police station, nothing turns on this finding.

inadvertently turned on for a different interview room. As a result, the interview was not recorded.[6] However, Officer Roberts was able to observe and listen to the interview on the recording system's monitor outside the interview room.

Sergeant Detective Stratton began the interview by explaining that the interview would be recorded and advising the defendant of his Miranda rights. The defendant was shown a form with each right listed, and the detective went over each right with the defendant. The defendant signed his initials next to each right, and indicated that he understood it. He also signed and printed his name at the bottom of the form.

During the course of the interview, the defendant made statements implicating himself in the victim's death. He stated that two days previously he had been with the victim at her apartment when they got into an argument around 9:00 P.M. The defendant stated that he struck the victim in the head twelve to fifteen times, that "she got it good," and that "I think I killed her." After he struck the victim, she lay on the couch, not moving, with blood on her face. The defendant fell asleep, and woke up early the next morning to find the victim had not moved. He believed he had killed her.

---

[6] The judge found that the first interview of the defendant was not recorded due to an error in turning on the recording equipment for the wrong interview room, and did not find that it was the result of any police misconduct.

The defendant told Sergeant Detective Stratton that he then left the apartment and took a train to meet his friend, Doucette. He told Doucette, "I think I killed [the victim]," and asked Doucette to return with him to the victim's apartment to check. Before they did so, they purchased beer, drank some together, and met with Finley. The three returned to the victim's apartment, where Doucette confirmed that the victim was deceased. They remained in the apartment and drank another beer while the defendant cleaned up. The defendant stated that he "mopped up some big puddles of blood in the apartment and took out some trash." Finley then called 911 to report that the victim was deceased. Doucette told the defendant that he should leave the apartment because the victim had an active restraining order against him, so he left the apartment and waited around the corner.

After he concluded the interview and left the room, Sergeant Detective Stratton learned of the error with the recording equipment. He returned to the interview room and explained to the defendant that the interview had accidently not been recorded, and asked the defendant if he was willing to do another interview. The defendant agreed, asking if he could have a cigarette first.

3. Recorded custodial interrogation. After being taken outside to smoke a cigarette, the defendant was brought back to

the interview room to be re-interviewed by Sergeant Detective Stratton with the proper recording system running. The videotape begins with an empty interrogation room. The videotape then shows Sergeant Detective Stratton and the defendant entering the room. Before commencing the second interview, Sergeant Detective Stratton showed the defendant the Miranda rights form that the defendant had initialed and signed prior to the first interview. Sergeant Detective Stratton read each right to the defendant and asked him if he understood it. The defendant indicated that he did. Sergeant Detective Stratton asked the defendant the same questions he had asked in the first interview, with the defendant giving similar answers. The second videotaped interview did not differ in any material respect from the unrecorded first interview. The defendant explained in detail the events surrounding the victim's death and what he did the next day after finding her apparently lifeless. The defendant repeated his admission to Sergeant Detective Stratton that he hit the victim in the head numerous times, and stated that he believed he had killed her. He stated that "she's dead because of me." Throughout the interview, the defendant asked Sergeant Detective Stratton when he was going to be released. After the conclusion of the second interview, the defendant was taken for photographs and booking. Because some of the defendant's clothing had apparent blood stains, his

clothing was held and submitted for forensic testing. The defendant was later indicted for the murder of the victim.

Discussion. 1. Standard of review. Ordinarily, when we review a ruling on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.'" Commonwealth v. Scott, 440 Mass. 642, 646 (2004), quoting from Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002). However, we apply a different standard when the judge's findings of fact are drawn from documentary evidence and there is no independent testimonial evidence to support those findings. As the Supreme Judicial Court has stated, "[w]e have consistently held that lower court findings based on documentary evidence available to an appellate court are not entitled to deference." Commonwealth v. Novo, 442 Mass. at 266. This is because we are in as good a position as the judge to view and assess such evidence. See Commonwealth v. DiGiambattista, 83 Mass. App. Ct. 180, 181 (2013).

The critical question in a case like this, in which the judge heard the testimony of three police officers in addition to the videotape evidence, is whether the controlling facts are attributable to the testimonial evidence or to the videotape, or a combination of the two. If the controlling facts (here the facts about the degree of the defendant's intoxication) are

based on testimonial evidence, we must defer to the judge's findings unless they are clearly erroneous. Commonwealth v. Hoose, 467 Mass. 395, 399-400 (2014). On the other hand, if the controlling facts were derived from documentary evidence, we are authorized to review those findings de novo. Commonwealth v. Clarke, 461 Mass. 336, 341 (2012) ("Here, to the extent that the judge based his legal conclusions on facts found by virtue of a video recording, we are in the same position as the [motion] judge in viewing the videotape" [quotation omitted]). In this case, the judge's several findings that the defendant was intoxicated during the first and second interviews were based on a combination of documentary and testimonial evidence. However, the controlling facts that support the judge's ultimate finding that the degree of the defendant's intoxication rendered him incapable of waiving his Miranda rights are based exclusively on documentary evidence.[7]

---

[7] In one respect, we conclude that a subsidiary finding that may have been important to the result reached by the judge is clearly erroneous. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 792 (1986), quoting from United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). The judge found that prior to the first unrecorded interview, "[Sergeant Detective Stratton] then read [the defendant] his Miranda rights from a preprinted form. [The defendant] put his initials next in [sic] each spot that Stratton told him to initial, and signed his name where Stratton told him to sign." Insofar as this finding means that Sergeant

    2. <u>The finding that the defendant was intoxicated, without more, does not support the judge's ultimate finding and ruling that there was no valid waiver of Miranda rights</u>. At several different points in his decision, the judge refers to the defendant as "intoxicated" or "quite intoxicated." The source of the evidence for these findings is both the testimony of the police officers and the videotaped interview of the defendant.

    The testimonial evidence relating to the defendant's consumption of alcohol consists of the following. Sergeant Detective Stratton testified at the motion to suppress hearing that the defendant stated during his interview that on the evening of Sunday, November 16, 2014, prior to the homicide, the defendant and the victim drank beer and took some pills. Sergeant Detective Stratton also testified that the defendant stated that he left the victim's apartment during the day of

_____

Detective Stratton told the defendant to sign the waiver form, there is no evidence in the testimony or in the videotape to support this finding. The testimony at the hearing before the judge was that, prior to the first interview, Sergeant Detective Stratton advised the defendant of his Miranda rights and went over each right on a printed form. The defendant wrote his initials next to each right and signed and printed his full name at the bottom of the form. The videotape shows that Sergeant Detective Stratton reviewed with the defendant each of the Miranda rights on the form before he conducted the second interview, and the defendant responded by stating that he understood his Miranda rights. Thus, insofar as the judge's finding that Sergeant Detective Stratton told the defendant to initial and sign the written Miranda rights form was intended to indicate that the defendant did not make a knowing, voluntary, and intelligent waiver of his Miranda rights before the first, unrecorded interview, we disregard it.

November 17 and met Doucette.  They purchased some beer.  There is videotape evidence of the defendant and Doucette standing on the platform at the Back Bay train station minutes before midnight on November 17 drinking from a can or bottle inside a paper bag.  The defendant also stated that when he, Doucette, and Finley returned to the victim's apartment during the early morning of November 18, he drank a beer before the victim's death was reported to the police at approximately 2:00 A.M. Finally, there is testimony from Officer Roberts, who detected a "slight odor of alcohol" on the defendant at the crime scene shortly before his arrest.[8]

The judge did not further explain what he meant by "intoxication."  Although the law recognizes that "the effects of liquor upon the mind and actions of men are well known to

---

[8] The bulk of the testimonial evidence regarding the defendant's intoxication, which the judge disregarded, as he was entitled to do, indicates that the defendant was not intoxicated.  For example, while Officer Roberts testified that the defendant had a "slight odor of alcohol" about him at the scene, he also testified that the defendant exhibited no other signs of intoxication, such as slurred speech or difficulty walking.  He also observed the defendant at the police station, and testified that the defendant did not appear to have difficulty understanding him and did not appear to be confused. Sergeant Yanovitch, who interacted with the defendant at the scene, testified that the defendant did not smell of alcohol and did not appear intoxicated.  Significantly, Sergeant Yanovitch also testified that Doucette did smell of alcohol and did appear intoxicated.  In addition, Sergeant Detective Stratton, who spent nearly three hours with the defendant, testified that the defendant did not smell of alcohol, did not slur his speech, was lucid, cooperative, and articulate, and did not appear intoxicated at any point that night.

everybody," Commonwealth v. Taylor, 263 Mass. 356, 362 (1928), the term intoxication does not have a single, uniform meaning. "Liquor affects individuals in various ways and it is sometimes difficult to determine degrees of intoxication." Holton v. Boston Elevated Ry. Co., 303 Mass. 242, 246 (1939).[9] It is precisely because the term intoxication refers to a range of conditions and competencies that the law recognizes that a person's intoxication does not preclude a determination that the person made a valid waiver of his Miranda rights.[10]

_____

[9] See Commonwealth v. Canty, 466 Mass. 535, 542 (2013) (lay opinion testimony regarding person's intoxication probative "because such an opinion, especially as to the level of intoxication, may be shaped by observations too numerous or subtle to mention" [emphasis original]). The fact that intoxication describes a range of conditions is reflected in our decisional law. See, e.g., Commonwealth v. Henson, 394 Mass. 584, 592-593 (1985) (defendant's voluntary intoxication does not negate specific intent as matter of law, but is factor which jury may consider in determining whether he had capacity to form specific intent); Commonwealth v. Urban, 450 Mass. 608, 613 (2008) (before jury may find that adult is incapable of consenting to sexual activity with another, they must find "an extreme degree of intoxication").

[10] The following cases illustrate that a person may be intoxicated and nonetheless make a valid waiver of Miranda rights. See, e.g., Commonwealth v. Simmons, 417 Mass. 60, 65 (1994) (noting that there was basis for judge's finding that "although the defendant may have been somewhat intoxicated when he spoke to the police, his mind was rational and his faculties were under control"); Commonwealth v. Mello, 420 Mass. 375, 383 (1995) ("intoxication alone is insufficient to negate an otherwise voluntary act"); Commonwealth v. Griffin, 19 Mass. App. Ct. 174, 182-183 (1985) (upholding judge's decision that defendant was under influence of alcohol, but nonetheless alert and capable of waiving his Miranda rights). See also Commonwealth v. Wolinski, 431 Mass. 228, 231 (2000) ("[T]he

"An otherwise voluntary act is not necessarily rendered involuntary simply because an individual has been drinking or using drugs."  Commonwealth v. Shipps, 399 Mass. 820, 826 (1987).[11]  For these reasons, we conclude that the judge's determination that the defendant was intoxicated at the time he was advised of his Miranda rights does not answer the question whether he was capable of validly waiving his Miranda rights. The answer to that question depends on whether there was physical or psychological coercion on the part of the police and whether, based on the totality of the circumstances, the defendant had the capacity to make a rational choice about

---

defendant was not intoxicated to the point his ability to think freely and rationally was impaired").

[11] The principle that intoxication alone does not preclude a person from making a valid waiver of Miranda rights and does not make an otherwise voluntary statement involuntary has been stated repeatedly by the Supreme Judicial Court and this court. See Commonwealth v. Doucette, 391 Mass. 443, 447-448 (1984); Commonwealth v. Shipps, supra at 826-827 (defendant appeared glassy-eyed and smelled of alcohol); Commonwealth v. Ward, 426 Mass. 290, 294 (1997) (defendant had been drinking for several hours, smelled of alcohol, and had .39 blood alcohol content); Commonwealth v. Wolinski, supra (defendant had drug and alcohol addiction and had used heroin earlier that day); Commonwealth v. Silanskas, 433 Mass. 678, 686 (2001) (officer testified that defendant smelled of alcohol and was under influence of alcohol); Commonwealth v. Duffy, 36 Mass. App. Ct. 937, 938-939 (1994) (defendant had been drinking before he walked into police station and confessed); Commonwealth v. Liptak, 80 Mass. App. Ct. 76, 79 (2011) (defendant had .19 blood alcohol content, had strong odor of alcohol on breath, and had been given morphine and oxycodone at hospital); Commonwealth v. Bigley, 85 Mass. App. Ct. 507, 509 (2014) (defendant had strong odor of alcohol, glassy eyes, and was unsteady on his feet).

whether to speak or to remain silent or to request an attorney. See Commonwealth v. Silanskas, 433 Mass. 678, 685-688 (2001). In the present case, the judge's answers to those questions were based entirely on the videotape evidence.

3. Waiver of Miranda rights. The judge connected his subsidiary finding that the defendant was intoxicated to his ultimate finding that the defendant was incapable of waiving his Miranda rights, and to his ruling that the Commonwealth did not meet its burden of proving a valid waiver of Miranda rights, by drawing inferences from the appearance and conduct of the defendant during the second, recorded, interrogation. Our independent review of the same evidence leads us to reach a different conclusion, namely, that based on the conduct of Sergeant Detective Stratton and the defendant's statements and behavior throughout the course of the videotape, the Commonwealth satisfied its heavy burden to prove that the defendant made a valid waiver of his Miranda rights. See Commonwealth v. Hilton, 443 Mass. 597, 607-608 (2005), S.C., 450 Mass. 173 (2007).

In deciding whether a defendant's waiver of his Miranda rights is valid, "[we] must examine the totality of the circumstances surrounding the making of the waiver." Commonwealth v. Edwards, 420 Mass. 666, 670 (1995), quoting from Commonwealth v. Medeiros, 395 Mass. 336, 345 (1985). This

requires us to consider such factors as the "conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, [and] physical and mental condition." Commonwealth v. Martinez, 458 Mass. 684, 692 (2011) (quotation omitted). An officer is entitled to rely on the suspect's outward appearance, words, and other behaviors in assessing whether he is capable of waiving his Miranda rights and whether he, in fact, did waive them. Commonwealth v. Lanoue, 392 Mass. 583, 588-589 (1984).

"[S]pecial care is taken to review the issue of voluntariness where the defendant claims to have been under the influence of drugs or alcohol." Commonwealth v. Mello, 420 Mass. 375, 383 (1995). When a suspect is under the influence of alcohol or drugs, "police should not assume they can immediately receive a knowing and intelligent waiver of Miranda rights and commence interrogation." Commonwealth v. Hosey, 368 Mass. 571, 579 (1975). Here, based on his viewing of the videotaped interview, the judge noted a number of factors that led him to conclude that the defendant was too intoxicated to waive his Miranda rights.

The judge found that the defendant was not paying attention when Sergeant Detective Stratton went over his Miranda rights again prior to the second interview. When asked if he understood each right, the defendant responded, "Yes" or

"Obviously." While the defendant does appear to be more interested in explaining why the arrest warrant was incorrect, we do not regard that as evidence that he did not understand what the warnings meant. The defendant was not a stranger to police. He had had numerous interactions with the police in the past, had been arrested on at least one prior occasion, and demonstrated knowledge of police procedures and the criminal justice system.[12] See Commonwealth v. St. Peter, 48 Mass. App. Ct. 517, 519-520 (2000) ("experience in the criminal justice system" is "relevant factor" with respect to Miranda rights waiver).

The judge also found that the defendant had "great difficulty walking" to his seat, and that he stumbled several times before sitting down. While the defendant does appear to stumble when he first enters the room with handcuffs on, at several points during the interview, the defendant stands up, and each time he appears quite steady on his feet. At one point, he stands to demonstrate how he hit the victim, and raises his knee while standing steady on one foot. When the

---

[12] For example, the defendant was hesitant to provide his name to Sergeant Yanovitch at the scene out of fear that the sergeant would "run" him. He knew the difference between a straight warrant and a default warrant. He had paperwork pertaining to an arrest warrant on his person. From his warrant for failing to register as a sex offender, it can be inferred that he had a prior conviction requiring him to register. See G. L. c. 6, § 178E(f).

defendant is led out of the room at the end of the interview, he shows no signs of unsteadiness or difficulty walking.[13]

The judge also found that the defendant "sounds drunk and seems to have trouble speaking clearly." To the contrary, the videotape demonstrates that the defendant is alert and his answers to questions are responsive, coherent, and often "quite self-serving."[14] Commonwealth v. Silanskas, 433 Mass. at 686. The defendant's speech is clear and he appears alert and awake, not groggy or drowsy. He recounts a relatively complex series of facts replete with specific details, such as bus numbers, the name and location of a liquor store, the victim's home telephone number, and the location of specific items in the victim's apartment. The defendant corrects Sergeant Detective Stratton at one point when he asked, "so what happened tonight?" The defendant replies, "actually, wait a minute, it didn't happen tonight."

The judge's conclusion was also based on his finding that the defendant did not appear to understand that he had

---

[13] The defendant also noted that he had previously sustained injuries requiring a hospital stay after jumping out of a fifth-floor window.

[14] There are numerous examples of the defendant's self-serving statements during the interview. He is careful to tell the police that he only hit the victim with an open hand, not with closed-fist punches, and that he only hit her in the face. He says repeatedly that he only went to the victim's apartment when she invited him, knowing that there was a restraining order. He also withholds Doucette's last name.

incriminated himself with his statements during the interview. The judge reasoned that, because the defendant continuously asked when he was going to be released, he did not understand the consequences of waiving his Miranda rights and speaking with the police. However, the videotape shows that the defendant is aware that his statements were incriminating. Throughout the interview, he is very animated and forceful when talking about why he believes he should not have been arrested on a warrant that should have been recalled, but when asked about what happened to the victim, he becomes very quiet and subdued. He pauses, drums his fingers on the table, breaks eye contact with Sergeant Detective Stratton, and mumbles. The defendant also demonstrates that he is conscious of the consequence of his actions when he states many times during the interview, "I fucked up." In addition, several times during the interview, he makes statements indicating that he knows criminal charges could come from his statements. For example, at one point, the defendant opines that the victim "died in her own blood," then raises his hands and says, "charge me with something." Later, he states, "Yeah I did whack her, and I'm sorry I did that. It sucks. But whatever you guys want to do." When asked if there was anything else he wanted to talk about, the defendant states, "I had a restraining order. I wasn't supposed to be there in the first place. So I'm, it's jail-bound regardless, right?"

The defendant also stated, "I've never done that to her before, either."[15]  Finally, toward the end of the interview, the defendant asks if he can see the victim.  When Sergeant Detective Stratton says no, the defendant says, "I'm going to jail aren't I?"  These statements demonstrate that the defendant was aware of the consequences of waiving his right to remain silent and speaking with the police.[16]  The Commonwealth's burden of proof with respect to the waiver of Miranda rights does not require it to establish that the defendant understood and appreciated the tactical or strategic consequences of waiving his Miranda rights.[17]

---

[15] This statement can be viewed as an attempt by the defendant to minimize the seriousness of his conduct by avoiding an admission that he is a repeat abuser.

[16] The judge viewed the defendant's admission of guilt and his questions about being released as so incompatible with one another that they were indicative of a person not thinking rationally.  However, those two aspects of the defendant's statements are not incompatible.  The videotape shows that the defendant strongly believed that the warrant was defective, and while he understood that there would be a penalty for being involved in the victim's death, he believed that the investigation was ongoing and that when it was time for charges to be filed, the police could easily find him because he was local.

[17] The police are not required to provide a suspect with a "flow of information to help him calibrate his self-interest in deciding whether to speak." Commonwealth v. Raymond, 424 Mass. 382, 393 (1997) (quotation omitted).  The duty to advise suspects of their Miranda rights prior to questioning does not include the "requirement that a defendant be advised of all the ramifications of any waiver of his rights." Commonwealth v. Lee, 10 Mass. App. Ct. 518, 529 (1980).  The police have no

The judge relied on Commonwealth v. Hosey, 368 Mass. 571 to support his conclusion that the defendant was incapable of making a rational choice. However, the facts of that case are markedly different from those in the case before us. In Hosey, the defendant was arrested for drunkenness while at the hospital, where his girl friend's young daughter was being treated for injuries. Id. at 573-574. After being taken to the police station and being advised of his Miranda rights, the defendant was questioned regarding the circumstances surrounding the injuries to the child. Id. at 576. The questioning officer testified that the defendant appeared "extremely high," "extremely emotional," and "detached from reality" while he was being questioned. Id. at 579. The court held that based on the observations by the police, the defendant could not have made a valid Miranda rights waiver and that officers should have ceased questioning the defendant until he was capable of responding intelligently. Ibid.

In addition, the circumstances surrounding the defendant's waiver in Hosey were concerning even without considering his

"duty to give legal advice to suspects." Commonwealth v. Cunningham, 405 Mass. 646, 657 (1989). The constitutional measure of whether a person's decision to waive his Miranda rights and speak with police without counsel present is not whether the decision is in his best interests, but rather whether it was a voluntary choice by a person who was aware of his rights and had the capacity to make a rational choice. See Commonwealth v. Magee, 423 Mass. 381, 386-387 (1996).

intoxication. In Hosey, when reviewing the defendant's Miranda rights during the questioning, one of the officers interjected that it would be difficult for the defendant to obtain counsel at 5:00 A.M., but that he could do so if he "insisted." Id. at 576. The court concluded that this statement, coupled with the defendant's mental condition and the officers' knowledge that the defendant wanted to finish quickly so that he could get to work at 6:00 A.M., was an improper attempt to induce a waiver. Id. at 578. As we said in Commonwealth v. Bigley, 85 Mass. App. Ct. 507, 513-514 (2014), "[t]he result in Hosey turned on a combination of three factors: severe intoxication, the officers' description of the defendant as 'detached from reality,' and the defective administration of Miranda rights." Hosey, thus, is not an appropriate guidepost for the present case.

For these reasons, on the basis of the same documentary evidence relied on by the judge below, our independent review leads us to conclude that the evidence was sufficient to meet the Commonwealth's burden to demonstrate that the defendant's waiver of his Miranda rights was knowing, intelligent, and voluntary. Contrary to the judge's conclusion, the video recording of the defendant's interview with the police does not reveal a person who is "far too intoxicated to be able to make a knowing and intelligent waiver of his right to remain silent."

See Commonwealth v. Simmons, 417 Mass. 60, 65-66 (1994). Instead, we have a settled conviction that notwithstanding the defendant's intoxication, he made a knowing, intelligent, and voluntary waiver of his Miranda rights.

4. Voluntariness. The defendant also contends, as with his Miranda rights waiver, that his intoxication at the time of his questioning by the police rendered his statements involuntary. Whether the defendant made a valid waiver of Miranda rights and whether any statements he made were voluntary are separate and distinct questions. See Commonwealth v. Magee, 423 Mass. 381, 387 (1996). When, as here, both issues are raised by the defendant, the judge must make findings and rulings on each question. See Commonwealth v. Melkebeke, 48 Mass. App. Ct. 364, 366 (1999). However, we have generally applied the voluntariness test only after concluding that the police complied with their obligations under Miranda v. Arizona, 384 U.S. 436, 469 (1966). Commonwealth v. Baye, 462 Mass. 246, 252 n.8 (2012). Here, the judge did not determine whether the defendant's statements were voluntary, as he concluded that the defendant did not knowingly and intelligently waive his Miranda rights. In the circumstances of this case, a remand to enable the judge to make findings of fact as to the issue of voluntariness is unnecessary because we are in as good a position to evaluate the recorded interview.

As with our analysis of the voluntariness of a Miranda rights waiver, we apply the "totality of the circumstances" test. Commonwealth v. Hensley, 454 Mass. 721, 730 (2009). "There is no bright line test for voluntariness . . . . [W]e [must] consider all of the relevant circumstances surrounding the statement[s] and the individual characteristics and conduct of the defendant." Commonwealth v. Burbine, 74 Mass. App. Ct. 148, 153 (2009). "A judicial determination of voluntariness involves an assessment of the totality of relevant circumstances to ensure that the defendant's [statements were] a free and voluntary act and [were] not the product of inquisitorial activity which had overborne his will." Commonwealth v. Allen, 395 Mass. 448, 454-455 (1985) (quotation omitted). Among the relevant factors we consider under the totality of the circumstances test are "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." Commonwealth v. Selby, 420 Mass. 656, 663 (1995). The focus of our inquiry into voluntariness is whether the incriminating statements were "the

result of coercion or intimidation." Commonwealth v. Durand, 457 Mass. 574, 595 (2010).

Here, the police did not engage in any coercion or use discredited tactics such as minimization of the crime, false promises, or assurances of leniency. See Commonwealth v. Baye, supra at 257-260. They did not mischaracterize the law so as to make the defendant think he was not confessing to a crime, or tell him that his statements would not be used against him. See Commonwealth v. DiGiambattista, 442 Mass. 423, 435 (2004); Commonwealth v. Tremblay, 460 Mass. 199, 211-212 (2011).

The determination of voluntariness also requires us to consider the defendant's physical and mental condition at the time he made the statements. See Commonwealth v. Lopes, 455 Mass. 147, 167 (2009). Statements that are the product of "a defendant's debilitated condition, such as insanity, drug abuse or withdrawal symptoms, [or] intoxication, are not the product of a rational intellect or free will and are involuntary." Commonwealth v. Allen, supra at 455 (citations omitted). "Although alcohol intoxication is an important factor bearing on the issue of voluntariness, intoxication alone is not sufficient to negate an otherwise voluntary act." Commonwealth v. Parker, 402 Mass. 333, 341 (1988). A defendant's personal characteristics and demeanor during an interrogation are

appropriate considerations when deciding the issue of voluntariness. See Commonwealth v. Durand, supra at 597-598.

Here, the defendant did not appear to be in the fragile physical or emotional state displayed by defendants in cases where the court found their statements involuntary. See, e.g., Commonwealth v. Meehan, 377 Mass. 552, 565-566 (1979) (evidence that defendant was in withdrawal from drug and alcohol intoxication). In contrast, throughout the videotaped interview, the defendant here appears "alert, oriented, and lucid." Commonwealth v. Durand, supra at 597. As noted in our discussion of his Miranda rights waiver, the defendant speaks clearly and effectively when describing a lengthy series of events taking place over a period of two days. He appears to understand Sergeant Detective Stratton's questions and responds appropriately. His answers are responsive, detailed, and at times, self-serving. On several occasions, he corrects Sergeant Detective Stratton when the latter incorrectly states something he recalls the defendant said previously. The defendant also waived his Miranda rights. See Commonwealth v. Selby, 420 Mass. 656, 664 (1995) (whether defendant waived his Miranda rights is factor in assessment of voluntariness of statement). In sum, consideration of the totality of the circumstances surrounding the defendant's statements, including the details noted earlier

in our discussion of the Miranda rights waiver issue, leads us to conclude that he spoke voluntarily.[18]

5. Seizure and forensic testing of clothing. The judge also suppressed the results of the forensic testing performed on the clothing seized from the defendant at the police station. The judge, finding that the defendant's statements implicating himself in the victim's death were obtained in violation of Miranda v. Arizona, 384 U.S. at 469, concluded that the police did not have probable cause to arrest the defendant for murder absent those statements, and thus the search of the defendant's clothing was invalid. He then reasoned that while the police could lawfully seize the defendant's clothing pursuant to the exigency exception to the search warrant requirement,[19] they were obliged to secure a warrant prior to subjecting the clothing to any forensic examination. See Commonwealth v. Straw, 422 Mass.

---

[18] Because we conclude that the voluntariness of the defendant's statements "appear[s] from the record with unmistakable clarity," Commonwealth v. Jackson, 432 Mass. 82, 85 (2000) (quotation omitted), we need not address the defendant's request to remand this case for findings and rulings on the voluntariness of the defendant's statements. Our conclusion that the Commonwealth met its heavy burden to establish that the defendant's statements at the police station were made voluntarily should not be understood as a ruling that at a trial voluntariness will not be a "live issue." Thus, if a trial in this case takes place, the judge may be obligated to instruct the jury on our "humane practice." See, e.g., Commonwealth v. Pavao, 46 Mass. App. Ct. 271, 273-274 (1999).

[19] See Illinois v. McArthur, 531 U.S. 326, 334 (2001); Commonwealth v. Gentile, 437 Mass. 569, 577 (2002).

756, 759 (1996) (warrant required to search briefcase as exigency expired once briefcase was seized).

No search warrant was required if the police had probable cause to arrest the defendant for the murder of the victim. See Commonwealth v. Santiago, 410 Mass. 737, 742-743 (1991). Under those circumstances, the police could have seized and tested the defendant's clothing pursuant to a search incident to a valid arrest. See Commonwealth v. Robles, 423 Mass. 62, 65-66 (1996). See also United States v. Edwards, 415 U.S. 800, 806 (1974) (police may seize clothing worn at time of arrest when it becomes apparent that clothing may contain evidence). When seizing a defendant's clothing incident to an arrest, the police need only establish that the clothing contained evidence connected to the crime. See Commonwealth v. Robles, supra. Because we determine that the defendant's statements were obtained in compliance with Miranda v. Arizona, supra, and were made voluntarily, the police had probable cause to arrest him for murder. Thus, the police were authorized to seize and subsequently test his clothing. See Commonwealth v. Robles, supra at 65 n.8 & 67-68, and cases cited.[20]

_____

[20] Even if the defendant's custodial statements are not considered, the police had probable cause to arrest the defendant for murder. The record shows that the defendant was first observed outside of the victim's residence in violation of an active restraining order. See Commonwealth v. Todd, 394 Mass. 791, 794-795 (1985) (lurking near murder scene combined

Conclusion.  This is a case in which a conscientious judge viewed a videotaped interrogation of the defendant that lasts approximately forty-five minutes and inferred from the defendant's appearance and conduct that he was intoxicated to such an extent that he was not capable of waiving his Miranda rights.  However, our independent review of the same documentary evidence leaves us with a settled conviction that the defendant had the capacity to make a knowing and voluntary waiver of his rights and that he did so.  The same evidence persuades us that the defendant's statements made during the first and second interviews were voluntary.  Finally, we conclude that the seizure and forensic testing of the defendant's clothing was justified as a search incident to a lawful arrest.  Accordingly, so much of the judge's order that allowed the defendant's motion to suppress is reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.

---

with other conduct could be viewed as consciousness of guilt).
The police knew that the victim had a history of domestic
violence incidents with the defendant as the primary aggressor.
The defendant also made statements to the police at the scene,
which the judge did not order suppressed, indicating that the
victim was his friend and that he knew what had happened to her.
Finally, the police observed blood on the defendant's clothing
and shoes, after investigating a murder scene that was "very
bloody."